**No. 16-10521**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

MAURICE WALKER, on behalf of himself and others similarly situated,

*Plaintiff-Appellee*,

v.

CITY OF CALHOUN, GA,

*Defendant-Appellant.*

————————

On Appeal from the United States District Court for the
Northern District of Georgia,
No. 4:15-cv-00170-HLM

————————

**BRIEF FOR *AMICI CURIAE* AMERICAN BAIL COALITION,
GEORGIA ASSOCIATION OF PROFESSIONAL BONDSMEN, AND
GEORGIA SHERIFFS' ASSOCIATION IN SUPPORT OF DEFENDANT-
APPELLANT AND REVERSAL OF THE PRELIMINARY INJUNCTION**

————————

PAUL D. CLEMENT
 *Counsel of Record*
MICHAEL H. MCGINLEY
MEGAN M. WOLD
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com
*Counsel for Amici Curiae*

June 21, 2016

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, Amici hereby certify that no publicly held corporation owns 10% or more of any of the Amici's stock.  Amici also certify that the following is a complete list of the trial judge and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal.

American Bail Coalition, Amicus

American Contractors Indemnity Corporation, Contributed Amicus Funding

Bail USA, Inc., Contributed Amicus Funding

Beacham III, A. Franklin, Attorney for Appellant

Brinson, Askew, Berry, Seigler, Richardson & Davis, LLP

Carlock, Copeland & Stair LLP

City of Calhoun, Georgia, Appellant

Clement, Paul D., Attorney for Amici

Davis, J. Anderson, Attorney for Appellant

Equal Justice Under Law

Geraghty, Sarah, Attorney for Appellant

Georgia Association of Professional Bondsmen, Amicus

Georgia Sheriffs' Association, Amicus

Govignon, George P., Attorney for Appellant

Case: 16-10521    Date Filed: 06/21/2016    Page: 3 of 39

Grozine, Abby C., Attorney for Appellant

Karakatsanis, Alec, Attorney for Appellee

Lucas, Samuel L., Attorney for Appellant

McGinley, Michael H., Attorney for Amici

Murphy, Honorable Harold L., United States District Judge

Palmetto Surety Corporation, Contributed Amicus Funding

Primerano, Ryan, Attorney for Appellee

Root, David F., Attorney for Appellant

Southern Center for Human Rights

Walker, Maurice, Appellee

Wold, Megan M., Attorney for Amici

Dated:  June 21, 2016

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

STATEMENT OF INTEREST ................................................................ 1

STATEMENT OF THE ISSUE ............................................................... 2

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ......................................................................................... 4

I.    Bail Is A Liberty-Promoting Institution As Old As The Republic ................. 4

    A.    The Modern System of Bail Is Deeply Rooted in the American Legal Tradition ..................................................... 5

    B.    Modern Commercial Sureties Are the Most Effective and Efficient Means to Balance the Interests of Defendants and Communities ......................................................................... 8

        1.    The costs of abandoning monetary bail ..................................... 9

        2.    The efficacy of commercial sureties ....................................... 12

II.    The City Of Calhoun's Bail System Is Constitutional ................................ 17

    A.    Monetary Bail Is Constitutional ........................................ 17

    B.    Plaintiff's Constitutional Challenge to the City of Calhoun's Bail System Is Meritless ................................................. 21

    C.    The City of Calhoun's Bail Schedule and Standing Order Are Rationally Related to a Legitimate Government Interest .................. 26

CONCLUSION .................................................................................... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Albright v. Oliver*,
  510 U.S. 266, 114 S. Ct. 807 (1994)............................................................ 22, 27

*Atwater v. City of Lago Vista*,
  532 U.S. 318, 121 S. Ct. 1536 (2001)...................................................................27

*Bearden v. Georgia*,
  461 U.S. 660, 103 S. Ct. 2064 (1983)...................................................................23

*Bell v. Wolfish*,
  441 U.S. 520, 99 S. Ct. 1861 (1979)....................................................................29

*Collins v. Ainsworth*,
  382 F.3d 529 (5th Cir. 2004)..............................................................................26

*\*County of Riverside v. McLaughlin*,
  500 U.S. 44, 111 S. Ct. 1661 (1991)............................................................ 27, 28

*Ex parte Milburn*,
  34 U.S. (9 Pet.) 704 (1835)........................................................................... 7, 18

*Fields v. Henry Cty.*,
  701 F.3d 180 (6th Cir. 2012)......................................................................... 20, 26

*Gerstein v. Pugh*,
  420 U.S. 103, 95 S. Ct. 854 (1975)......................................................................27

*Graham v. Connor*,
  490 U.S. 386, 109 S. Ct. 1865 (1989)..................................................................22

*Griffin v. Illinois*,
  351 U.S. 12, 76 S. Ct. 585 (1956)................................................................. 22, 23

*Herman v. Jeuchner*,
  15 Q.B.D. 561 (1885)...........................................................................................8

---

[*] Citations upon which Amici primarily rely are marked with asterisks.

*Maher v. Roe*,
  432 U.S. 464, 97 S. Ct. 2376 (1977).....................................................................24

*\*Pugh v. Rainwater*,
  572 F.2d 1053 (5th Cir. 1978)............................................................ 18, 20, 23, 24

*Reese v. United States*,
  76 U.S. (9 Wall.) 13 (1869).................................................................................8

*Ross v. Moffitt*,
  417 U.S. 600, 94 S. Ct. 2437 (1974)...................................................................25

*\*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1, 93 S. Ct. 1278 (1973)........................................................ 24, 25, 26

*\*Stack v. Boyle*,
  342 U.S. 1, 72 S. Ct. 1 (1951)............................................................ 18, 19, 20, 21

*Tate v. Short*,
  401 U.S. 395, 91 S. Ct. 668 (1971).....................................................................23

*United States v. Feely*,
  25 F. Cas. 1055 (C.C.D. Va. 1813) ......................................................................7

*United States v. MacCollom*,
  426 U.S. 317, 96 S. Ct. 2086 (1976)...................................................................25

*\*United States v. Salerno*,
  481 U.S. 739, 107 S. Ct. 2095 (1987)............................................... 19, 23, 28, 29

*Woods v. Michigan City*,
  940 F.2d 275 (7th Cir. 1991)..............................................................................27

## Constitutional Provision

U.S. Const., amend. VIII...........................................................................................18

## Statutes

Ga. Code §17-6-50.1 .................................................................................................1

Ga. Code §17-6-56.1 .................................................................................................1

**Other Authorities**

James Austin et al., *Evaluation of the Current and Future Los Angeles County Jail Population* (Apr. 10, 2012) ............................................................16

William F. Duker, *The Right to Bail:  A Historical Inquiry*,
42 Alb. L. Rev. 33 (1977) ........................................................................... 5, 6, 8

Equal Justice Under Law, Litigation:  Ending the American Money Bail System, http://bit.ly/1TXOgJv (last visited June 21, 2016).......................18

Eric Helland & Alexander Tabarrok, *The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping*,
47 J. L. & Econ. 93 (2004) ............................................................10, 11, 13, 14

Daraius Irani et al., *Estimating the Cost of the Proposed Maryland Pretrial Release Programs* (2014), http://bit.ly/1ttuwFn ...................................15

Daraius Irani & Zachary Jones, Regional Economic Studies Institute, *Estimating the Cost of the Proposed New Jersey Pretrial Service Unit and the Accompanying Legislation* (2014),
http://bit.ly/1UQKz90 ...........................................................................15

Clara Kalhous & John Meringolo, *Bail Pending Trial: Changing Interpretations of the Bail Reform Act and the Importance of Bail from Defense Attorneys' Perspectives*, 32 Pace L. Rev. 800 (2012)...................15

Robert G. Morris, Dallas County Criminal Justice Advisory Board, *Pretrial Release Mechanisms in Dallas County, Texas* (Jan. 2013),
http://bit.ly/1tttqJD......................................................................... 10, 13

Philadelphia Inquirer, *Justice:  Delayed, Dismissed, Denied*,
Dec. 13-16, 2009.....................................................................................12

*Pretrial Release of Felony Defendants in State Courts* (2007)
(revised Jan. 2008)................................................................................11, 13, 14

*Report of the Advisory Committee on the Criminal Justice System in Philadelphia* (Jan. 2013), http://bit.ly/25Y8c8s ...................................11

*The Cost of Crime to Society: New Crime-Specific Estimates for Policy and Program Evaluation* (2011).................................................11

iv

## STATEMENT OF INTEREST

American Bail Coalition is a non-profit professional trade association of national bail insurance companies that underwrite criminal bail bonds throughout the United States. The Coalition's primary purpose is to protect the constitutional right to bail by bringing best practices to the system of release from custody pending trial. The Coalition works with local communities, law enforcement, legislators, and other criminal justice stakeholders to use its expertise to develop more effective and efficient criminal justice solutions. Coalition member companies currently have 17,368 bail agents under appointment to write bail bonds in the United States.

The Georgia Association of Professional Bondsmen is a non-profit professional trade association dedicated to encouraging professionalism among bondsmen, providing educational opportunities to its members, and promoting cooperation between the bail bonding profession and the criminal justice system. The Association has over 175 members who represent bonding companies and agents throughout Georgia. By Georgia law, the Association is responsible for approving and conducting all mandatory continuing education programs for all bail bond and bail recovery agents operating in Georgia. Ga. Code §§17-6-50.1, 17-6-56.1. The Association thus educates and trains approximately 1,500 bail agents in the State of Georgia.

The Georgia Sheriffs' Association is a non-profit professional organization for Georgia's 159 elected sheriffs. Among other things, the Association provides training for sheriffs and related personnel, and it advocates for crime control measures and laws that promote professionalism and enhanced effectiveness in the Office of the Sheriff throughout Georgia.[1]

The outcome of this case will determine the extent to which bond schedules remain a constitutional way for communities to set bail for defendants when a judge is not present. Amici believe that bond schedules and bail systems like Appellant's are constitutionally permissible and, when set appropriately, allow for the timely and expedited release of defendants.

The parties have consented to the filing of this amicus brief, which Amici file in support of Appellant. No counsel for any party authored this brief in whole or in part, and no counsel or party other than those listed made a monetary contribution intended to fund the preparation or submission of this brief.

## STATEMENT OF THE ISSUE

The question addressed in this brief is whether plaintiff is likely to succeed on the merits of his constitutional claim.

---

[1] American Contractors Indemnity Corporation, Bail USA, Inc., and Palmetto Surety Corporation, which are not members of the amici, also contributed funds to support the preparation and submission of this brief.

2

## SUMMARY OF ARGUMENT

Plaintiff would have this Court effectively abolish monetary bail on the theory that any defendant is entitled to *immediate* release based on an unverified assertion of indigency.  Nothing in the Constitution supports that extreme position.  Instead, the text and history of our founding charter conclusively confirm that monetary bail is constitutional.

Since long before the Founding, bail has enabled communities to protect themselves and secure a defendant's appearance for trial while allowing the accused to avoid pretrial detention.  And monetary bail facilitated by the commercial surety industry is the single most effective and efficient way to achieve those goals.  Defendants bailed by a commercial surety are far more likely to appear in court and far less likely, if they fail to appear, to remain at large for extended periods of time.  Moreover, by enabling defendants to post bail with only a fraction of the required amount, the commercial bail industry allows individuals of all financial means to leverage their social networks and community ties to obtain pretrial release.

The City of Calhoun's monetary bail system is clearly constitutional.  The Constitution prohibits only *excessive* bail.  Yet, plaintiff has not claimed that his bail was excessive under the Eighth Amendment.  Instead, he attacks the City's bail system—and monetary bail in general—alleging that it discriminates against the indigent.  But it does no such thing.  Under the City's bail schedule, a defendant's

3

bail amount is initially set to match the crime he is accused of committing. And under the City's Standing Order, within 48 hours, each defendant is afforded an individualized hearing where he has the opportunity to demonstrate that his bail should be reduced or eliminated.

Under the Fourteenth Amendment, distinctions based on wealth must only be rationally related to a legitimate government purpose, and the City's bail system is eminently rational. Its bail schedule efficiently serves the twin goals of bail by enabling defendants to obtain pretrial release (often without having to wait for a hearing) while protecting the community. And the City's Standing Order is consistent with the constitutional deadline for holding a probable cause hearing under the Supreme Court's decision in *County of Riverside v. McLaughlin*. No more rapid timeline is required for assessing a claim of indigency. In fact, the Supreme Court expressly contemplated that probable cause and bail hearings would occur in tandem. It thus simply cannot be that *any* defendant arrested for *any* crime must be *immediately* released based on a bare assertion of indigency, as plaintiff's theory would require. The District Court's injunction should be reversed.

## ARGUMENT

### I.    Bail Is A Liberty-Promoting Institution As Old As The Republic.

Since before the Founding, American communities have employed systems of bail to guarantee criminal defendants' appearance for prosecution while enabling the

accused to secure their liberty before trial.  The American colonies developed bail procedures based on English practices, and they retained those practices at independence.  While bail practices have evolved with the times, their chief purpose remains the same:  Since our Nation's birth, systems of bail like the City of Calhoun's have protected both the liberty interests of defendants and the security interests of communities.  Plaintiff's constitutional challenge is a frontal attack on this well-founded tradition.

### A.    The Modern System of Bail Is Deeply Rooted in the American Legal Tradition.

Even before independence, bail existed within the American colonies, modeled largely on the English bail system.  For example, in colonial Virginia as early as 1689, sheriffs were responsible for administering a system of bail.  They could release a defendant before trial so long as the sheriff accepted a sufficient bail to ensure the individual's appearance in court proceedings.  In the event a defendant failed to appear, the sheriff would be liable to pay the award to the court himself, which encouraged sheriffs to be judicious in their allowance of bail.  William F. Duker, *The Right to Bail:  A Historical Inquiry*, 42 Alb. L. Rev. 33, 77-78 (1977).  In 1705, Virginia reformed its system to require that individuals accused of bailable crimes be held first in county jail and not transferred to the public jail at Williamsburg for at least twenty days.  *Id*. at 78.   These reforms kept the accused

5

closer to home and thus increased the likelihood of him obtaining bail through access to friends and relatives who could provide the surety. *Id*.

Other colonies operated similar systems. In colonial Massachusetts, the law prohibited restraint before conviction for bailable offenses if the person could be "put in sufficient security, Bayle or Mainprise for his appearance, and good behavior in the meantime." *Id*. at 79. And in colonial Pennsylvania, all prisoners were bailable "by one or more sufficient sureties … unless for such offenses as are made felonies of death by the laws of this province." *Id*. at 80.

Upon independence, the newly confederated States retained their bail systems, and some added bail provisions to their constitutions. Virginia's 1776 constitution stated that "excessive bail ought not to be required," *id*. at 81, and Georgia and North Carolina followed suit by adopting similar provisions, *id*. at 82, n. 293. Following the Philadelphia Convention in 1789, when the idea of amending the new federal Constitution to include a Bill of Rights gained traction, North Carolina proposed that an excessive bail provision be among the suggested amendments considered. *Id*. at 83. Thus, the Eighth Amendment to the U.S. Constitution provides that "excessive bail shall not be required." On the same day that Congress passed that amendment as part of the Bill of Rights, it also passed the Judiciary Bill, which required bail to be admitted in all cases "except where punishment may be by death." *Id*. at 85.

6

These statutory and constitutional provisions and the early case law applying them underscore how bail has always struck a balance between the liberty of the accused and the security interests of the community.  In 1813, while riding circuit, Chief Justice John Marshall eloquently explained:  "The object of a recognizance is, not to enrich the treasury, but to combine the administration of criminal justice with the convenience of a person accused, but not proved to be guilty."  *United States v. Feely*, 25 F. Cas. 1055, 1057 (C.C.D. Va. 1813).  And in 1835, Justice Story, writing for a unanimous Supreme Court, echoed that sentiment:  "A recognizance of bail, in a criminal case, is taken to secure the due attendance of the party accused, to answer the indictment, and to submit to a trial, and the judgment of the court thereon."  *Ex parte Milburn*, 34 U.S. (9 Pet.) 704, 710 (1835).  Thus, bail has always been understood "as a means of compelling the [accused] party to submit to the trial and punishment, which the law ordains for his offence," and not as a form of punishment or discrimination against the poor.  *Id*.

The modern bondsman likewise has deep roots in our legal tradition.  Intrinsic to the common law tradition of bail in both England and the United States was the role of a surety, who would guarantee the accused's appearance in court and undertake to produce the accused in the event of non-appearance.  This concept was well-developed by the seventeenth century in England, where bail became a procedure permitting an individual to be released from jail and delivered into the

7

custody of a surety—who was, in essence, a jailer of his choice.  *The Right to Bail*,

at 70.  Under this view, it was essential that a surety be "bound at his peril to see that

his principal obeys the Court."  *Id*. at 71 (quoting *Herman v. Jeuchner*, 15 Q.B.D.

561, 563 (1885)).

American courts adopted this view of suretyship.  In 1869, the Supreme Court

explained that "[b]y the recognizance the principal is, in the theory of the law,

committed to the custody of the sureties as to jailers of his own choosing."  *Reese v.

United States*, 76 U.S. (9 Wall.) 13, 21 (1869).  While that does not mean the

principal "can be subjected by [the surety] to constant imprisonment," the surety was

empowered to "surrender him to the court, and, to the extent necessary to accomplish

this, may restrain him of his liberty."  *Id*.  Under this arrangement, the government

also agreed "that it will not in any way interfere with th[e surety] covenant" or "take

any proceedings with the principal which will increase the risks of the sureties or

affect their remedy against him."  *Id*. at 22.

### B.    Modern Commercial Sureties Are the Most Effective and Efficient Means to Balance the Interests of Defendants and Communities.

Consistent with its history, the commercial bail industry provides the single

most effective and efficient means of allowing defendants to obtain pretrial release

while ensuring the protection of local communities and their resources.  While

pretrial detention imposes burdens on criminal defendants, pretrial release poses

serious risks to communities.  Like the historical surety system, the modern

8

commercial bail industry exists to strike the balance between those interests. By enabling defendants to post bond at a fraction of the required amount, the industry facilitates the pretrial liberty of the accused. And by assuming responsibility for the defendant's appearance at trial, the industry protects the community's interest in prosecuting criminals for their offenses.

### 1.    The costs of abandoning monetary bail

The alternatives to monetary bail—uniform release or uniform detention—are both unpalatable. A system of uniform pretrial detention would promote community safety and secure every defendant's appearance at trial, but impose significant burdens on criminal defendants' liberty interests. While in jail, a criminal defendant has less access to his defense attorney and the materials useful in preparing a defense. Pretrial detention can also reduce a defendant's ability to raise money to hire counsel, particularly where incarceration results in job loss. Detained individuals, moreover, suffer in their employment and familial relationships, leaving lasting ramifications even for defendants who are later acquitted. And uniform pretrial detention would impose a significant cost-burden on local communities, while placing additional stress on overcrowded jail facilities.

But releasing all accused on the mere promise to appear would wreak untold consequences on our communities. Released defendants would have significantly less incentive to appear for their court hearings and might commit additional crimes

while released.  *See, e.g.*, Eric Helland & Alexander Tabarrok, *The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping*, 47 J. L. & Econ. 93, 94 (2004).  When a defendant fails to appear, local courts must reschedule proceedings, wasting the time of court personnel, judges, lawyers, and testifying witnesses, including victims, and inhibiting the community's ability to enforce its laws.  *Id.*  Studies conservatively estimate that the cost to the public for each failure to appear is approximately $1,775.  *See* Robert G. Morris, Dallas County Criminal Justice Advisory Board, *Pretrial Release Mechanisms in Dallas County, Texas* 17 (Jan. 2013), http://bit.ly/1tttqJD.  Most communities, quite logically, have no interest in inviting these harms.

A defendant who fails to appear for a scheduled court hearing also incurs an additional criminal charge and an associated warrant, which imposes more costs on law enforcement who must track down missing defendants, diverting scarce community resources from other law enforcement efforts.  *The Fugitive*, at 98.  This is no trifling concern.  To take an example, Philadelphia releases approximately half of its criminal suspects on personal recognizance and for a long time prohibited commercial bail.  As of November 2009, Philadelphia's "count of fugitives (suspects on the run for at least a year) numbered 47,801," and in 2007 and 2008 alone, "19,000 defendants each year—nearly one in three—failed to appear in court for at

least one hearing." *Report of the Advisory Committee on the Criminal Justice System in Philadelphia* 19 (Jan. 2013), http://bit.ly/25Y8c8s.

Outlawing monetary bail or commercial sureties would produce similarly high failure-to-appear rates throughout the country. Law enforcement is not staffed or funded to re-arrest defendants who fail to appear. Thus, without monetary bail and the commercial surety system, the community risks encouraging further criminal behavior and losing any incentive for securing appearance, which adds to the public costs of crime—which already total in the hundreds of billions of dollars, *see* National Institute of Health, *The Cost of Crime to Society: New Crime-Specific Estimates for Policy and Program Evaluation* 1-2 (2011)—and further diminishes the rule of law. Surety bonds are the best way of preventing these risks to the public because the probability of being recaptured while released on a surety bond is 50% higher than for those released on other types of bonds or on their own recognizance. *The Fugitive*, at 113.

Even *with* the protection of bail, 16% of felony defendants in large urban counties are rearrested before trial based on 1996 statistics compiled by the Justice Department. Bureau of Justice Statistics, *Pretrial Release of Felony Defendants in State Courts* 8 (2007) (revised Jan. 2008) (overall pretrial misconduct rates of released defendants ranged from 31% to 35% annually between 1990 and 2004). Without any surety to guarantee appearance, these rates are sure to increase. And

11

innocent Americans bear the brunt of these additional crimes, through additional victimization and the deterioration of communities. *See, e.g.*, Philadelphia Inquirer, *Justice: Delayed, Dismissed, Denied*, originally published in four parts from December 13-16, 2009 (describing how Reginald Strickland, free on bail, "went on a rampage, raping or assaulting four women within days of each other").

Monetary bail systems strike an efficient balance between these competing interests. Pretrial release is preferred only so long as courts can assure communities of their safety and ensure the appearance of defendants in court. Thus, through commercial sureties, criminal defendants are able to gain pretrial release, while maintaining a strong incentive to appear for trial and to avoid additional arrest. The accused thus suffer minimal disruption to their family life and employment and maximize their ability to prepare a defense. And local communities can be confident in defendants' appearance at trial without the significant costs of wide-scale pretrial detention or the significant concerns with an unsecured system of pretrial release.

## 2.    The efficacy of commercial sureties

Any attack on the modern bail system thus bears the heavy burden of proposing a workable alternative. But plaintiff has offered none. And the evidence suggests there is none. The modern commercial surety system has statistically proven to be the most effective means of enabling defendants to obtain pretrial release while ensuring they appear in court.

In a commercial surety system, a court or bail schedule sets the amount required for bail based on the defendant's risk of flight and danger to the community. A defendant may then post the amount of bail either with the court directly or through a private party. With a third-party commercial surety, the defendant pays a portion of the bail amount to the surety (usually 10%) and the surety posts the full amount with the court. If the defendant fails to appear, the surety forfeits the posted bail unless he can produce the defendant, and the defendant becomes liable to the surety for the full bail. *The Fugitive*, at 97.

Statistical studies show that a commercial surety provides the greatest protection against failure to appear. One report determined that "[d]efendants released on a surety bond are 28 percent less likely to fail to appear than similar defendants released on their own recognizance, and if they do fail to appear, they are 53 percent less likely to remain at large for extended periods of time." *The Fugitive*, at 118. Another study of pretrial release mechanisms in Dallas County, Texas concluded that defendants released on surety bonds were the least likely to abscond. *Pretrial Release Mechanisms*, at 5. And a Special Report from the United States Department of Justice reached the same conclusion: "Compared to release on recognizance, defendants on financial release were more likely to make all scheduled court appearances." *Pretrial Release of Felony Defendants in State Courts*, at 1. Specifically, in the federal government's study, a surety bond had the second lowest

13

failure-to-appear rate at 18%, bested only by a 14% failure-to-appear rate for property bonds, which accounted for just 1% of releases. *Id*. at 8. The highest failure-to-appear rates belonged to emergency release (45%) and unsecured bonds (30%), *id.*, which the District Court's injunction effectively imposes here.

These statistical results comport with common sense. Defendants who obtain release through a commercial surety owe a bondsman the full amount of bail in the event they fail to appear. But since defendants often lack the resources to pay the full amount, a commercial surety is incentivized to produce the defendant rather than pursue the repayment of the bond. To do so, they often enlist the help of a defendant's community by obtaining contact information for friends and family, using cosigners on the surety, and requiring periodic check-ins and monitoring. *The Fugitive*, at 97. Bondsmen are able to pursue these strategies without public expense and without diverting the resources of law enforcement. And because the bondsman earns his living in the industry, his incentives for returning defendants are very high. By some estimates, a bondsman requires a 95% appearance rate from defendants just to break even. *Id*.

Other systems, like state-facilitated pretrial supervision, are incredibly costly. For instance, researchers have predicted that bail reform proposals in Maryland, which would provide pretrial supervision and social services for all defendants released without a surety, would cost the state between $102 and $200 million

14

annually. Daraius Irani et al., *Estimating the Cost of the Proposed Maryland Pretrial Release Programs* 10 (2014), http://bit.ly/1ttuwFn. A 2012 analysis predicted that New Jersey's similar pretrial supervision program would cost $16 million to initiate and about $375 million to operate year-to-year. Daraius Irani & Zachary Jones, Regional Economic Studies Institute, *Estimating the Cost of the Proposed New Jersey Pretrial Service Unit and the Accompanying Legislation* 4 (2014), http://bit.ly/1UQKz90. The analysis also predicted an additional $65 million of indirect costs caused by additional public defender and courtroom usage and the failure-to-appear and recidivism of released defendants. *Id*. Given the financial constraints already faced by states and municipalities, these types of costs are simply unreasonable for most communities.

By contrast, the commercial bail system often involves a defendant's social and community network to secure his appearance, thus furthering the twin goals of our bail tradition. Commercial bonds give criminal defendants the opportunity to rely on their network and reputation in obtaining pretrial release, by asking relatives, friends, and neighbors to assist them with posting bail. And a defendant with significant community ties is more likely to appear. *See* Clara Kalhous & John Meringolo, *Bail Pending Trial: Changing Interpretations of the Bail Reform Act and the Importance of Bail from Defense Attorneys' Perspectives*, 32 Pace L. Rev. 800, 841 (2012). Commercial sureties also permit bail for only a fraction of

15

what the court requires and often offer installment plans to facilitate payment. Thus, rather than *discriminating* against the poor, the system is designed to *support* those of lesser means by enabling them to secure their liberty through limited funds while enlisting the assistance of their social network and a commercial bondsman to assure their appearance at trial and the safety of the community.[2]

*      *      *

Understood within its historical context and sound policy objectives, our modern system of bail is fundamentally not about poverty or wealth, but instead about preserving liberty while ensuring community safety and appearance in court. Defendants who cannot post bail are not detained because they are poor, but instead because the government had probable cause to arrest them and charge them with a crime, and wishes to secure their appearance at trial. The lead plaintiff in this case is a prime example: He was not arrested because he is impoverished. He was arrested because he violated the law. But on plaintiff's view the City had no choice but to release him *immediately* once he said he could not post bail under the bail schedule—whether or not the City had any meaningful assurance that he would

---

[2] Nor is it true, as plaintiff has suggested, that pretrial detainees remain in jail solely because they cannot afford bail. In many cases, a detained defendant is not eligible for bail because, for instance, he previously failed to appear, he is accused of an especially dangerous crime, or there are other outstanding warrants against him. *See, e.g.*, James Austin et al., *Evaluation of the Current and Future Los Angeles County Jail Population* 25-26 (Apr. 10, 2012).

appear at any future adjudication.  This automatic system of catch-and-release is fundamentally inconsistent with American tradition, makes zero practical sense, and is by no means compelled by the Constitution.

## II.     The City Of Calhoun's Bail System Is Constitutional.

Plaintiff mounts a frontal constitutional attack on monetary bail.  He insists that the City release any defendant who says he cannot post bail—and that it do so *immediately*, without any reasonable time for a hearing.   But the Constitution requires neither of those demands.  The Supreme Court has repeatedly recognized that monetary bail is a constitutional means of protecting society and securing the accused's appearance at trial.  Indeed, the text of the Constitution pre-supposes that bail is permissible by prohibiting only *excessive* bail.  The Court has likewise held that, to the extent an initial hearing is required, state and local governments need only act within a reasonable amount of time, not immediately upon arrest.  And the City's bail schedule and Standing Order fall well within the bounds of reason.

### A.     Monetary Bail Is Constitutional.

At its root, plaintiff's suit is an assault on the traditional American system of secured monetary bail.  Plaintiff demands that anyone arrested in Calhoun who merely states that he cannot afford bail must be released on his own recognizance. Indeed, the practical effect of the District Court's injunction is to require precisely that system of mandatory unsecured bail.  According to plaintiff, an individualized

indigency determination within 48 hours is not enough. And this is hardly an isolated case: Plaintiff's attorneys have sought similar injunctions across the country, while touting their goal of "ending the American money bail system." Equal Justice Under Law, Litigation: Ending the American Money Bail System, http://bit.ly/1TXOgJv (last visited June 21, 2016).

But the Constitution clearly permits communities to adopt monetary bail procedures aimed at securing appearance at trial and protecting society from dangerous individuals. As a textual matter, the Eighth Amendment pre-supposes the permissibility of monetary bail. If plaintiff's theory were correct, the Eighth Amendment would read: "no bail shall be required." But instead it provides only that "*[e]xcessive* bail shall not be required." U.S. Const., amend. VIII (emphasis added). And the American criminal justice system has long relied on secured bail to balance the interest of pretrial liberty with the interest in protecting the community.

The Supreme Court's decisions underscore this fact. In *Stack v. Boyle*, the Court emphasized that "[t]he right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." 342 U.S. 1, 4, 72 S. Ct. 1, 3 (1951) (citing *Ex parte Milburn*, 34 U.S. (9 Pet.) at 710); *accord Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978). "[T]he modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture" the Court explained, "serves as additional assurance of the

18

presence of an accused." *Stack*, 342 U.S. at 5, 72 S. Ct. at 3. Thus, far from prohibiting monetary bail, the Constitution simply requires that it not be excessive. And that question turns primarily "on standards relevant to the purpose of assuring the presence of th[e] defendant," not on whether the defendant is capable of posting bail at the moment of arrest. *Id.*

Indeed, the mine-run of bail cases take the constitutionality of monetary bail as given. In *United States v. Salerno*, 481 U.S. 739, 107 S. Ct. 2095 (1987), for instance, the Court rejected a facial attack on the federal Bail Reform Act, holding that neither the Due Process Clause nor the Eighth Amendment prohibited the government from detaining especially dangerous defendants, *without bail*, in order to protect the community from danger. The Court's analysis, and the parties' arguments, never questioned that pretrial detention and monetary bail are constitutional, and that "a primary function of bail is to safeguard the courts' role in adjudicating the guilt or innocence of defendants." 481 U.S. at 753, 107 S. Ct. at 2104. The only dispute was whether the government may *also* set bail or insist on pretrial detention based on its desire to protect the community from especially dangerous individuals. As to that question, the Court found there to be no constitutional problem.

The same principles apply to monetary bail schedules, which set default bail amounts for various crimes based on the severity of those offenses. *See, e.g.*, *Fields*

*v. Henry Cty.*, 701 F.3d 180, 184 (6th Cir. 2012).  Especially for small localities, like the City of Calhoun, this routinized process is much more efficient than requiring an individualized bail hearing for every single offense by every single offender.  By setting presumptive bail amounts, a "bond schedule represents an assessment of what bail amount would ensure the appearance of the average defendant facing such a charge" and is "therefore aimed at assuring the presence of a defendant."  *Id.* Moreover, because they apply to all alike, "bond schedules are aimed at making sure that defendants who are accused of similar crimes receive similar bonds," *id.*, consistent with Eighth Amendment interests in avoiding excessive bail.  *Cf. Stack*, 342 U.S. at 5, 72 S. Ct. at 3.

This efficient process saves time for both the government and the accused. "Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meeting its requirements." *Rainwater*, 572 F.2d at 1057.  And for those who have difficulty in meeting the presumptive bail amount, the government can provide a hearing at which a magistrate can adjust bail appropriately.  That is precisely what the City does here.  The City's Standing Order requires that any individual who cannot post the amount required by the bail schedule receive a bail hearing within 48 hours of arrest, the same amount of time required under the Fourth Amendment for a probable cause hearing.

20

Thus, as with any other system of monetary bail, bail schedules serve the same well-founded interests in enabling defendants to obtain pretrial release—in many cases even more quickly than in traditional systems—while protecting the community and securing the defendants' later appearance for prosecution and sentencing. That the method begins with a presumption that can be adjusted to meet the needs of unique cases renders it logical and efficient, not unconstitutional.

### B.    Plaintiff's Constitutional Challenge to the City of Calhoun's Bail System Is Meritless.

Plaintiff would have this Court ignore the deep history of monetary bail in this country, the significant societal interest in securing appearance for prosecution, and the reasonable nature of the City's bail schedule and Standing Order in favor of sound-bites and invective. He has not alleged that the bail assigned to him is "excessive" under the Eighth Amendment, which is the constitutionally prescribed avenue for challenging the amount of bail. *See, e.g.*, *Stack*, 342 U.S. at 1, 72 S. Ct. at 1. Instead, he claims that the Due Process and Equal Protection Clauses of the Fourteenth Amendment require the *immediate* release of *any* defendant who says he cannot *afford* the required bail. And he accuses the City of "jailing the poor because they cannot pay a small amount of money." Doc. 1 Compl. ¶1.

But this gets things exactly backwards. As a factual matter, criminal defendants like Mr. Walker are jailed because there is probable cause to believe they committed crimes and because society has an interest in securing their appearance

at trial.  As a legal matter, the Fourteenth Amendment cannot be employed to invalidate bail procedures that the Eighth Amendment allows.  Instead, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994) (plurality) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989)).[3]  And the Court has never accepted—in fact, it has rejected—the sort of wealth-based disparate impact claims plaintiff asserts.

Plaintiff principally relies on a series of Supreme Court cases holding that the government cannot deny access to the courts or impose harsher punishment based on the inability to pay a fine or fee.  But the City's bail schedule and Standing Order do neither of those things.  In *Griffin v. Illinois*, 351 U.S. 12, 13, 76 S. Ct. 585, 588 (1956), the Supreme Court struck down a state policy that "den[ied] adequate appellate review to the poor while granting such review to all others" by requiring a mandatory fee to obtain trial transcripts.  The inability to obtain transcripts, the Court

---

[3] For similar reasons, challenges to bail are ill-suited to class actions.  The Eighth Amendment contemplates an individualized assessment of whether a defendant's bail is excessive, not broadside attacks on generally applicable bail systems.  For that reason and those advanced by the City, if the Court addresses the question, it should reverse the District Court's order granting class certification.

reasoned, effectively required defendants to accept their conviction and sentence without challenge, and thus an individual's indigency directly affected his ultimate punishment. *See id.* at 17-18, 590 (plurality). Here, defendants are not denied the ability to appeal their convictions or otherwise precluded from defending the charges against them. Nor was the force of the State's interest in *Griffin*—lowering court costs—anything remotely approaching the City's interests here.

The Supreme Court's decisions in *Tate v. Short*, 401 U.S. 395, 91 S. Ct. 668 (1971), and *Bearden v. Georgia*, 461 U.S. 660, 103 S. Ct. 2064 (1983), are similarly off-point. In both cases, the government increased a convicted criminal's punishment because he could not afford a fine. Thus, as in *Williams*, a defendant's sentence was directly tied to his financial status. *See Tate*, 401 U.S. at 397-98, 91 S. Ct. at 670. But, again, the City's bail schedule has no direct effect on a defendant's actual sentence, and the Supreme Court clearly held in *Salerno* (which post-dates *Williams*, *Tate*, and *Bearden*) that "pretrial detention … does not constitute punishment." 481 U.S. at 748, 107 S. Ct. at 2102. Moreover, while pretrial detention may make preparing a defense more difficult, the Court has held that the community's interests in security and preserving the judicial process outweigh that interest (except in cases of excessive bail, of which there is no claim here).

Nor does the Fifth Circuit's (pre-split) decision in *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc), support plaintiff's position. If anything, it confirms

23

that the City's procedures are constitutional.  In *Rainwater*, the court upheld Florida's monetary bail schedule against an attack similar to the claims leveled in this case.  The class of plaintiffs there, like plaintiff here, argued that the "inevitable result" of the bail schedule would be uniform "pretrial detention of indigents." *Id.* at 1058.  But the court noted that Florida's policy required "that 'all relevant factors' be considered in determining 'what form of release is necessary to assure the defendant's appearance,'" and when necessary a "judge w[ould] determine the amount of a monetary bail." *Id.*  That was enough to ensure the policy's constitutionality.  The Standing Order provides a similar safety-valve by guaranteeing all defendants a hearing within 48 hours of arrest.

Without support in any precedent, plaintiff's argument resolves to no more than a wealth-based disparate impact claim under the Equal Protection Clause.  But the Supreme Court has repeatedly rejected such claims.  In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S. Ct. 1278 (1973), the Court turned away a claim by students in districts with lower property tax revenues (and thus lower funding for their schools), holding that strict scrutiny does not apply to wealth-based claims and more broadly that, "where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Id.* at 24, 1291; *see also Maher v. Roe*, 432 U.S. 464, 471, 97 S. Ct. 2376, 2381 (1977) (rejecting the notion that "financial need alone identifies a suspect class for purposes

24

of equal protection analysis"). Refusing to extend *Griffin* to all wealth-based disparate-impact claims, the Supreme Court explained that *Griffin* and its progeny involved "an absolute deprivation of the desired benefit," while the students in *Rodriguez* were not denied an education. 411 U.S. at 23, 93 S. Ct. at 1291. And the Court has since clarified that, even "[i]n the context of a criminal proceeding, [equal protection] require[s] only 'an adequate opportunity to present (one's) claims fairly.'" *United States v. MacCollom*, 426 U.S. 317, 324, 96 S. Ct. 2086, 2091 (1976) (plurality) (quoting *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S. Ct. 2437, 2447 (1974)).

Those standards are plainly met here. The City does not deny defendants the opportunity to obtain pretrial release; nor does it deny them an adequate opportunity to present a defense. On the contrary, it allows indigent defendants to secure pretrial liberty. At most, it simply requires them to demonstrate, at a hearing held within 48 hours of arrest, that they are in fact indigent. The mere fact that those who can promptly assure their appearance at trial are released more quickly than those who cannot does not render the City's bail system unconstitutional—it makes it rational. Indeed, at its core, plaintiff's demand of immediate release without bail is not a request for *equal* treatment; it is a request for a constitutional windfall. The Standing Order already allows indigent defendants to obtain release on personal recognizance—on their mere promise to appear—while many other arrestees must provide financial security. The Equal Protection Clause hardly requires that this

25

more lenient treatment be offered instantaneously, without any hearing to determine

whether a defendant is actually entitled to the benefit of release without bail.

### C. The City of Calhoun's Bail Schedule and Standing Order Are Rationally Related to a Legitimate Government Interest.

Moreover, even if Calhoun's policies resulted in some brief period of unequal

treatment, that would not render them unconstitutional.  Because indigence is not a

suspect class under the Equal Protection Clause, the bail schedule and Standing

Order need not satisfy strict scrutiny.  Instead, the City's policy must only be

rationally related to a legitimate government interest.  *See, e.g.*, *Rodriguez*, 411 U.S.

at 55, 93 S. Ct. at 1308.  It clearly meets that standard.  As explained above, monetary

bail rationally serves the government's legitimate interest in securing the appearance

of the accused at trial.  And the City's bail schedule rationally serves its legitimate

interest in providing an efficient bail process that reduces the costs associated with

individualized bail hearings and enables many defendants to quickly post bail.  The

City's Standing Order, meanwhile, provides an opportunity to establish indigency

and secure release within 48 hours of arrest.  Thus, indigent defendants are not

denied the opportunity to secure their pretrial release at all.  At most, they have to

wait two days to be excused of the normal obligation to post a secured bond.

That minor delay is not unconstitutional.  As other courts have recognized,

"[t]here is no constitutional right to speedy bail."  *Fields*, 701 F.3d at 185; *see also*

*Collins v. Ainsworth*, 382 F.3d 529, 545 (5th Cir. 2004) ("There is no right to post

bail within 24 hours of arrest."); *Woods v. Michigan City*, 940 F.2d 275, 283 (7th Cir. 1991) (Will, D.J., concurring) ("Nothing in the eighth amendment … guarantees instant release for misdemeanors or any other offense.").  "The Framers considered the matter of pretrial deprivations of liberty and drafted the [Eighth] Amendment" to address concerns with bail. *Albright*, 510 U.S. at 274, 114 S. Ct. at 813.  But they imposed no time requirement on that process.

Nor does any other provision of the Constitution require an immediate bail determination.  If anything, the Supreme Court's decisions in other areas confirm the opposite.  The Supreme Court has long recognized that "States have a strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity."  *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, 111 S. Ct. 1661, 1668 (1991).  To that end, the Court has held that, under the Fourth Amendment, law enforcement may constitutionally arrest individuals without a warrant and detain them for a reasonable period of time, not to exceed 48 hours from arrest, before holding a probable cause hearing.  *Id*. at 54-56, 1668-70; *accord Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854 (1975).  This reasonable safe harbor reflects "a practical compromise between the rights of individuals and the realities of law enforcement."  500 U.S. at 53, 111 S. Ct. at 1668.  And it applies to both serious felonies and misdemeanors punishable only by a fine.  *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S. Ct. 1536 (2001).

No shorter period of time can possibly be required for setting bail. Like the competing interests in *Riverside*'s Fourth Amendment analysis, the Court's bail cases have always recognized the need to weigh society's "interest in preventing crime by arrestees" and "safeguard[ing] the courts' role in adjudicating the guilt or innocence of defendants" against "the individual's strong interest in liberty." *Salerno*, 481 U.S. at 749-50, 753, 107 S. Ct. at 2103-04. Calhoun has chosen to strike this balance by tying the deadline for an individualized bail assessment to the deadline for a probable cause hearing under *Riverside*. There is no reason why that timeframe would be reasonable in one context but not the other. Indeed, the Supreme Court "explicitly contemplated" that local governments might prefer to "[i]ncorporat[e] probable cause determinations 'into the procedure for setting bail or fixing other conditions of pretrial release.'" *Riverside*, 500 U.S. at 54, 111 S. Ct. at 1668 (quoting *Gerstein*, 420 U.S. at 124, 95 S. Ct. at 868)). And *Riverside* set the outer limit at 48 hours precisely so that this "flexibility" would be possible. *Id.* The City's Standing Order is plainly consistent with that purpose.

Plaintiff's theory, by contrast, would require through the Fourteenth Amendment precisely what the Supreme Court has avoided reading into the Fourth and Eighth Amendments. In doing so, it would upset the delicate balance struck in *Riverside*, *Salerno*, *Stack*, and many other cases by elevating the accused's interest in release over society's interests in security and the judicial process. But, if the

28

scales tip in either direction, it is the opposite one:  The Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Salerno*, 481 U.S. at 748, 107 S. Ct. at 2102.  It is equally settled that "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, [and] that confinement of such persons pending trial is a legitimate means of furthering that interest." *Bell v. Wolfish*, 441 U.S. 520, 534, 99 S. Ct. 1861, 1871 (1979).  Thus, "the Government may permissibly detain a person suspected of committing a crime prior to a formal adjudication of guilt." *Id.*  And nothing in the Constitution requires that a defendant properly held for trial be afforded a bail hearing immediately upon arrest.  Plaintiff's claims thus necessarily fail, and the District Court's injunction cannot stand.

## CONCLUSION

This Court should reverse the preliminary injunction.

Respectfully submitted,

s/ Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
MICHAEL H. MCGINLEY
MEGAN M. WOLD
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com
*Counsel for Amici Curiae*

June 21, 2016

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) because this brief contains 6,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman type.

Dated:  June 21, 2016

s/ Michael H. McGinley
Michael H. McGinley

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/ Paul D. Clement</u>
Paul D. Clement