No. 16-10521

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

MAURICE WALKER, on behalf of himself
and others similarly situated,

*Plaintiff-Appellee*,

v.

CITY OF CALHOUN, GEORGIA,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court
for the Northern District of Georgia,
No. 4:15-cv-170-HLM

_____

**BRIEF OF APPELLEE**

_____

Alec Karakatsanis                         Sarah Geraghty
EQUAL JUSTICE UNDER LAW                    Ryan Primerano
601 Pennsylvania Avenue NW                 SOUTHERN CENTER
South Building, Suite 900                  FOR HUMAN RIGHTS
Washington, DC 20004                       83 Poplar Street NW
(202) 681-2409                             Atlanta, GA 30303
alec@equaljusticeunderlaw.org             (404) 688-1202
                                           sgeraghty@schr.org

*Counsel for Plaintiff-Appellee*

August 11, 2016

No. 16-10521, *Walker v. City of Calhoun*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-2(b), Plaintiff-Appellee hereby certifies that the certificate of interested persons contained in Defendant-Appellant's principal brief, served on June 14, 2016, as supplemented by the certificates in the briefs of all amici curiae, is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations that have an interest in the outcome of this case or appeal, with the following additions:

1.   American Bar Association (amicus curiae);

2.   Brown, Paulette (counsel for amicus curiae);

3.   Center for Legal and Evidence-Based Practices (amicus curiae);

4.   Moore, Leland John (counsel for amicus curiae);

5.   Wilmer, Cutler, Pickering, Hale & Dorr LLP (counsel for amicus curiae);

6.   Wolfson, Paul R.Q. (counsel for amicus curiae).


/s/ Sarah Geraghty

August 11, 2016

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Maurice Walker respectfully requests that this case be placed on the oral argument calendar.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT .....................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION...........................................................3

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE..................................................................3

    A.    Maurice Walker's Detention Under the City of Calhoun's
        Bail Policy ...............................................................3

    B.    District Court Proceedings and Preliminary Injunction.......................5

STANDARD OF REVIEW .....................................................................9

SUMMARY OF THE ARGUMENT ......................................................9

ARGUMENT ...................................................................................12

I.    The District Court Correctly Determined That Walker Is Likely to
    Succeed on the Merits....................................................................12

    A.    The City Violates the Fourteenth Amendment by Detaining
        People for up to Seven Days, or Two Days Under Its
        Revised Policy, Solely for Failing to Pay a Preset Amount of
        Money...................................................................13

        1.    Keeping people in jail only because they are indigent
            violates equal protection and due process principles................13

2.     The rule against wealth-based detention applies to money bail regimes ...................................................16

3.     The City's bail regime violates the constitutional rights of indigent traffic-offense and misdemeanor arrestees by providing a mechanism for immediate release to people who can pay, but not the poor ......................20

B.     The District Court's Injunction Narrowly and Appropriately Corrects the Constitutional Violations ................................................26

C.     There Is No Procedural or Jurisdictional Impediment to Injunctive Relief ................................................................................29

1.     The challenge to the original policy is not moot .....................29

2.     The injunction is consistent with O.C.G.A. § 17-6-1 ..............33

3.     The injunction is consistent with *Younger* ................................36

4.     The injunction is consistent with *Preiser* .................................40

5.     The City can be enjoined from enforcing its bail policy..........................................................................................43

a.     Under § 1983, the challenged conduct is the result of the City's official policy...................................44

i.      The City has control over the post-arrest procedures that its officers apply to arrestees ..............................................................45

ii.     The City has the power to control post-arrest procedures by ordinance............................48

iii.    The City's municipal judge is a final policymaker for the City, not the state ................52

       b.     Independent of § 1983, there is an implied right of action under the Constitution for equitable relief against the City ........................................................ 57

II.    The District Court Acted Within Its Discretion in Finding That Equitable Considerations Favor a Preliminary Injunction ........................... 59

     A.    Walker Would Suffer Irreparable Harm Absent Injunctive Relief ................................................................................ 59

     B.    The Balance of Equities Favors Protecting Walker's Fundamental Rights ............................................................ 60

     C.    The Injunction Advances the Public Interest ..................................... 61

CONCLUSION ......................................................................................... 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Abusaid v. Hillsborough Cty. Bd. of Comm'rs*,
  405 F.3d 1298 (11th Cir. 2005) ...................................................53, 55

*Ashcroft v. Am. Civil Liberties Union*,
  542 U.S. 656 (2004)............................................................................12

*Barnett v. Hopper*,
  548 F.2d 550 (5th Cir. 1977) .............................................................15

\* *Bearden v. Georgia*,
  461 U.S. 660 (1983)..............................................13, 15, 16, 25, 38

*Bell v. Wolfish*,
  441 U.S. 520 (1979)............................................................................26

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) .........................................................15

*Brown v. City of Fort Lauderdale*,
  923 F.2d 1474 (11th Cir. 1991) ...................................................48, 52

*Brown v. Plata*,
  563 U.S. 493 (2011)............................................................................41

*Campbell v. Johnson*,
  586 F.3d 835 (11th Cir. 2009) ...........................................................23

*City News and Novelty v. City of Waukesha*,
  531 U.S. 278 (2001)............................................................................30

*City of Lawrenceville v. Davis*,
  502 S.E.2d 794 (Ga. 1998) ................................................................53

*City of Macon v. Davis*,
  305 S.E.2d 116 (Ga. 1983) ................................................................52

*Cooper v. Aaron*,
    358 U.S. 1 (1958)...............................................................................58

*Cooper v. Dillon*,
    403 F.3d 1208 (11th Cir. 2005) ........................................................56

*Craft v. State*,
    269 S.E.2d 490 (Ga. Ct. App. 1980)..................................................37

*Cumulus Media v. Clear Channel Comm.*,
    304 F.3d 1167 (11th Cir. 2002) ..........................................................9

*Depew v. City of St. Marys*,
    787 F.2d 1496 (11th Cir. 1986) ...................................................48, 52

*Doe v. Wooten*,
    747 F.3d 1317 (11th Cir. 2014) ...................................................30, 32

*Ex parte Young*,
    209 U.S. 123 (1908)...........................................................................58

*Fed. Trade Comm'n v. Phoebe Putney Health Sys., Inc.*,
    133 S. Ct. 1003 (2013).......................................................................52

*Forrester v. White*,
    484 U.S. 219 (1988)...........................................................................56

*Foucha v. Louisiana*,
    504 U.S. 71 (1992).............................................................................23

\* *Frazier v. Jordan*,
    457 F.2d 726 (5th Cir. 1972) .............................................................15

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477  (2010)..........................................................................58

*Friends of the Earth, Inc. v. Laidlaw Environmental Serv. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................30

*GeorgiaCarry.Org v. U.S. Army Corps of Eng'rs*,
788 F.3d 1318 (11th Cir. 2015) ............................................................9

*Gerstein v. Pugh*,
420 U.S. 103 (1975)...............................................36, 37, 41, 42, 43

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)...........................................................................24

*Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*,
377 U.S. 218 (1964)...........................................................................58

*Griffin v. Illinois*,
351 U.S. 12 (1956).................................................................................1

*Grovenstein v. Effingham Cty.*,
414 S.E.2d 207 (Ga. 1992) ...............................................................52

*Halbert v. Michigan*,
545 U.S. 605 (2005)...........................................................................22

*Harrell v. The Florida Bar*,
608 F.3d 1241 (11th Cir. 2010) ........................................................32

*Hispanic Interest Coalition of Ala. v. Governor of Ala.*,
691 F.3d 1249 (11th Cir. 2012) ...................................................59, 61

*Hodgers-Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) ..........................................................60

*Hoefling v. City of Miami*,
811 F.3d 1271 (11th Cir. 2016) ...................................................44, 48

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ...................................................44, 57

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989)...........................................................................44

*Jones v. City of Clanton*,
No. 2:15-cv-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015) ......................20

*Kesler v. State*,
291 S.E.2d 497 (Ga. 1982) ...............................................................................37

*Knox v. Serv. Employees Int'l Union*,
132 S. Ct. 2277 (2012)................................................................................30, 33

*Lebron v. Sec'y, Fla. Dep't of Children and Families*,
710 F.3d 1202 (11th Cir. 2013) ........................................................................12

*Lee v. Lawson*,
375 So. 2d 1019 (Miss. 1979)...........................................................................19

*Lightfoot v. Henry Cty. Sch. Dist.*,
771 F.3d 764 (11th Cir. 2014) .........................................................................55

*Lopez-Valenzuela v. Arpaio*,
770 F.3d 772 (9th Cir. 2014) ...........................................................................23

*Los Angeles Cty. v. Humphries*,
562 U.S. 29 (2010)...........................................................................................59

*Mandel v. Doe*,
888 F.2d 783 (11th Cir. 1989) .........................................................................51

*Manders v. Lee*,
338 F.3d 1304 (11th Cir. 2003) .......................................................................53

*Matthews v. Columbia Cty.*,
294 F.3d 1294 (11th Cir. 2002) .......................................................................44

*McMillan v. Johnson*,
88 F.3d 1573 (11th Cir. 1996) .........................................................................44

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982)...........................................................................36, 38, 39

*Monell v. New York City Dep't of Soc. Serv.*,
    436 U.S. 658 (1978)..................................................................43, 59

*Munaf v. Geren*,
    553 U.S. 674 (2008)........................................................................40

*Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*,
    633 F.3d 1297 (11th Cir. 2011) .........................................................32

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015).....................................................................14

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) .........................................................62

*Owens v. Fulton Cty.*,
    877 F.2d 947 (11th Cir. 1994) ..........................................................55

*Parents Involved v. Seattle Sch. Dist.*,
    551 U.S. 701 (2007)..............................................................30, 31, 33

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986)..................................................................44, 52

*Pine v. City of West Palm Beach*,
    762 F.3d 1262 (11th Cir. 2014) .........................................................34

*Plyler v. Doe*,
    457 U.S. 202 (1982)........................................................................24

*Pompey v. Broward Cty.*,
    95 F.3d 1543 (11th Cir. 1996) ..........................................................39

\* *Pugh v. Rainwater*,
    572 F.2d 1053 (5th Cir. 1978) ...................................17, 18, 20, 36, 59

*Pugh v. Rainwater*,
    557 F.2d 1189 (5th Cir. 1977) ....................................................18, 22

*Pugh v. Rainwater*,
    483 F.2d 778 (5th Cir. 1973) ...............................................................39

*Rich v. Sec'y, Fla. Dep't of Corr.*,
    716 F.3d 525 (11th Cir. 2013) ...............................................31, 32, 33

*Richardson v. Ala. State Bd. of Educ.*,
    935 F.2d 1240 (11th Cir. 1991) .................................................30, 52

*Robertson v. Goldman*,
    369 S.E.2d 888 (W.Va. 1988)...............................................................19

*Rodriguez v. Providence Cmty. Corr.*,
    No. 3:15-cv-1048, 2015 WL 9239821 (M.D. Tenn. Dec. 17, 2015).................20

*Sapuppo v. Allstate Floridian Ins. Co.*,
    739 F.3d 678 (11th Cir. 2014) .................................................30, 46

*Schilb v. Kuebel*,
    404 U.S. 357 (1971).............................................................22, 24

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) .......................................................61

*Skinner v. Switzer*,
    562 U.S. 521 (2011)............................................................40, 42

*State v. Blake*,
    642 So. 2d 959 (Ala. 1994)..............................................19, 24, 25

*Supreme Ct. of Va. v. Consumers Union*,
    446 U.S. 719 (1980)...........................................................56

\*   *Tate v. Short*,
    401 U.S. 395 (1971)..........................................................14, 15, 21

*Turner v. Rogers*,
    131 S. Ct. 2507 (2011)......................................................16

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ....................................................9, 61

*United States v. Bogle*,
855 F.2d 707 (11th Cir. 1988) ...........................................................59

*United States v. Bowers*,
660 F.2d 527 (5th Cir. Unit B. Sept. 1981) ........................................49

*United States v. Montalvo-Murillo*,
495 U.S. 711 (1990)............................................................................23

*United States v. Salerno*,
481 U.S. 739 (1987)............................................................................23

*Ward v. City of Cairo*,
583 S.E.2d 821 (Ga. 2003) ..............................................53, 54, 55

*Wilkinson v. Dotson*,
544 U.S. 74 (2005)........................................................40, 41, 42, 43

\* *Williams v. Illinois*,
399 U.S. 235 (1970)...................................................................13, 14

*Wood v. Orange Cty.*,
715 F.2d 1543 (11th Cir. 1983) .........................................................47

*Younger v. Harris*,
401 U.S. 37 (1971)..............................................................................36

*Zadvydas v. Davis*,
533 U.S. 678 (2001)............................................................................23

## CONSTITUTIONAL PROVISIONS

Ga. Const. art. VI, § 1 ...................................................................53, 54

Ga. Const. art. VI, § 7 ...........................................................................54

## STATUTES

28 U.S.C. § 1292 ................................................................................................3

28 U.S.C. § 2403 ..............................................................................................34

O.C.G.A. § 15-9-1 ............................................................................................54

O.C.G.A. § 15-9-63 ..........................................................................................54

O.C.G.A. § 17-6-1 ...........................................................................10, 33, 34, 35

O.C.G.A. § 17-6-2 ..............................................................................................7

O.C.G.A. § 36-32-2 .....................................................................................53, 54

O.C.G.A. § 36-32-2.2 .......................................................................................54

O.C.G.A. § 36-33-1 ..........................................................................................53

O.C.G.A. § 36-34-2 .....................................................................................48, 51

O.C.G.A. § 36-35-3 ..........................................................................................48

O.C.G.A. § 36-35-6 ..........................................................................................48

O.C.G.A. § 40-6-95 ............................................................................................4

O.C.G.A. § 42-4-1 .......................................................................................45, 47

## ORDINANCES

Albany Code § 22-164 .......................................................................................50

Atlanta Code § 62-81 ........................................................................................50

Austell Charter § 4.13 .......................................................................................50

Cairo Code § 9-13 .............................................................................................50

Calhoun Charter § 1-102 .......................................................................... 51

Calhoun Charter § 1-104 .......................................................................... 51

Calhoun Charter § 6-102 .................................................................... 51, 54

Calhoun Charter § 6-104 ............................................................................ 4

Calhoun Code § 1-7 ................................................................................. 25

Calhoun Code § 10-38 .............................................................................. 25

Calhoun Code § 22-232 ............................................................................ 25

Calhoun Code § 22-321 ............................................................................ 25

Calhoun Code § 30-6 ............................................................................... 25

Calhoun Code § 50-75 .............................................................................. 25

Calhoun Code § 62-1 ............................................................................... 25

Calhoun Code § 90-113 ............................................................................ 49

Calhoun Code § 90-39 .............................................................................. 46

Calhoun Code § 90-43 .............................................................................. 46

Calhoun Code § 94-83 .............................................................................. 25

Camilla Code § 2-5-6 ............................................................................... 50

Cedartown Code § 34-37 .......................................................................... 49

College Park Code § 1-10 .................................................................... 49, 50

Colquitt Code § 30-37 .............................................................................. 50

Conyers Code § 2-5-6 .............................................................................. 49

Decatur Code § 22-49 ............................................................................................50

Doraville Code § 11.1 ............................................................................................50

Douglasville Code § 1-10 .......................................................................................49

Flowery Branch Code § 23-6 .................................................................................50

Greensboro Code § 16-11 ......................................................................................49

Griffin Code § 38-6 ...............................................................................................50

Hapeville Code § 2-7-7 ..........................................................................................49

Jonesboro Code § 30-18 .........................................................................................50

Kennesaw Code § 38-46 .........................................................................................50

LaGrange Code § 5-20-13 ......................................................................................50

Lake City Code § 24-5 ...........................................................................................50

Macon Code § 11-7 ................................................................................................49

Manchester Code § 34-44 .......................................................................................49

Marietta Code § 1-12-060 ......................................................................................50

Morrow Code § 2-4-6 .............................................................................................49

Norcross Code § 10.7 .............................................................................................50

Peachtree City Code § 46-16 ..................................................................................49

Peachtree City Code § 46-51 ..................................................................................50

Riverdale Code § 50-1 ...........................................................................................50

Rome Code § 12-103 ..............................................................................................49

Rome Code § 13-51 .................................................49

Roswell Code § 11.2.1 ..............................................50

Senoia Code § 44-6..................................................50

Smyrna Code § 34-49 ...............................................49

Stockbridge Code § 2.20.080.......................................50

Sylvania Code § 46-26..............................................50

Sylvester Code § 38-45.............................................50

Union Point Code § 34-48 ..........................................50

Warner Robins Code § 15-8 ........................................50

## RULES

N.D. Ga. L.R. 7.1 .....................................................6

Ga. Unif. Muni. Ct. R. 18.1 ....................................49, 51

Ga. Unif. Muni. Ct. R. 18.3 ......................................35

## COURT DOCUMENTS

Br. of State of Texas as Amicus Curiae, *Gerstein v. Pugh*, No. 73-477, 1974 WL 186448 (U.S. Aug. 19, 1974) ..........................42

## OTHER AUTHORITIES

17B Charles Alan Wright *et. al.*, *Federal Practice and Procedure* § 4252 (3d ed. 2016)...................37

## INTRODUCTION

Defying the principle of "equal justice to all and special privileges to none in the administration of its criminal law," *Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956), the City of Calhoun asks this Court to endorse a bail system that jails only the poor and lets those with means go free, with no benefit to public safety. The City offers a valuable entitlement to traffic and misdemeanor arrestees: immediate release for everyone who can secure, as bail, the "expected fine with applicable surcharges" tied to each offense. A.295 (Doc. 29-5 at 6).[1] With present ability to pay that amount the sole condition for release from jail, arrestees who can pay bail go free regardless of demonstrated flight risk, criminal record, or degree of intoxication. Only those unable to pay—no matter how strong their ties to the community or record of law-abiding behavior—must wait in jail up to a week for a hearing before a judge.

Like many other indigent people, Maurice Walker was on the losing end of the City's policy when he was arrested for a misdemeanor offense. Disabled and lacking cash or property, he could not deposit the $160 fine and surcharges that the City required for his release, so he remained in jail awaiting a court date set for more than a week away.

---

[1] "A.___" refers to the designated page of the 649-page appendix filed by the City of Calhoun on June 16, 2016.

1

The City does not dispute that Walker would have a cause of action if he had been found guilty and detained for days solely for failing to pay a court-ordered fine. It acknowledges "a litany of cases" to that effect in its brief. Appellant's Br. 46. But the City contends that the same practice that courts have uniformly held unconstitutional after a defendant has been sentenced is permissible as long as the defendant is not yet convicted.

The City offers no plausible public safety justification for its bail regime. The only evidence that the City has submitted on the policy—a revised version of its policy that reduces the period of wealth-based jailing from seven days to two days—makes clear that the one interest it rationally furthers is in exacting up-front payment of fines and fees "for disposition should the accused later [be convicted]." A.295 (Doc. 29-5 at 6).

The district court identified the controlling precedents, applied them faithfully to the facts, and correctly held the City's policy unconstitutional. After considering the traditional equitable factors that govern preliminary injunctive relief and the harm that the City's post-arrest procedures cause indigent people like Walker, the district court entered a narrow order that left broad discretion with the City to choose how it would comply. The district court's legal conclusions are correct and its exercise of discretion sound. Its decision should be affirmed.

2

## STATEMENT OF JURISDICTION

Maurice Walker adopts the City of Calhoun's statement of jurisdiction with respect to the district court's original jurisdiction. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's interlocutory order granting a preliminary injunction.

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in finding that Maurice Walker is likely to succeed on his claim that the City of Calhoun violates the Fourteenth Amendment by releasing all arrestees who can afford to pay a money bail in a predetermined amount while detaining only those who cannot for up to seven days (under the policy in effect when the complaint was filed) or two days (under the revised policy that the City revealed three months into the litigation).

2. Whether the district court abused its discretion in finding that Maurice Walker satisfies the equitable requirements for injunctive relief because Walker and similarly situated people will suffer irreparable harm if the City continues to release those with means and detain only the indigent after arrest.

## STATEMENT OF THE CASE

### A.    Maurice Walker's Detention Under the City of Calhoun's Bail Policy

Maurice Walker is a 54-year-old man with a mental health disorder that renders him disabled and unable to work.  A.83 (Doc 4-1 ¶¶ 1-4).  He lives in

3

Calhoun, Georgia, with his sister, who manages his $530 monthly disability check. A.83 (Doc. 4-1 ¶ 4). Walker's has no income apart from disability payments, owns no property, and has no driver's license. A.83 (Doc. 4-1 ¶¶ 4-5).[2]

Walker was arrested by the Calhoun Police Department on September 3, 2015. A.83 (Doc. 4-1 ¶ 2). A police officer charged him with being a pedestrian under the influence, *id.*, which is a misdemeanor punishable by a $500 fine, O.C.G.A. § 40-6-95. The charge was within the jurisdiction of Calhoun's municipal court, A.330 (Doc. 29-6 at 18) (Calhoun Charter § 6-104(b)(2)), and the municipal court convened only on Mondays, A.347 (Doc. 31 ¶ 14). Due to the Labor Day holiday on Monday, September 7, Walker's first opportunity to appear before the municipal court was scheduled for September 14—eleven days after his arrest. A.64-65 (Doc. 1 ¶ 14).

Under the bail policy in effect at the time of Walker's arrest, the City of Calhoun allowed arrestees to be released immediately if they paid a certain amount of money to the City. A.65-66 (Doc. 1 ¶ 19). The amount that an arrestee had to pay was determined by a "bail schedule" that listed all offenses within the municipal court's jurisdiction along with a fixed cash bond amount beside each

---

[2] The City asserts that Walker provided "no facts or objective information to determine that he is in fact 'indigent.'" Appellant's Br. 4. However, Walker's mental illness, limited income, and lack of property are empirically verifiable facts that were contained in his affidavit. A.83 (Doc. 4-1).

offense.  A. 65-66 (Doc. 1 ¶ 19); *see* A.299-307 (Doc. 29-5 at 8-16).  The amount
that an arrestee had to pay was based on the fine and statutory surcharges normally
imposed by the municipal court upon conviction for the relevant charge.  *See*
A.299-307 (Doc. 29-5 at 8-16); A.295 (Doc. 29-5 at 4).  Arrestees who could not
pay the listed amount were kept in jail to wait for the next municipal court session,
which could take a week or longer.  A.64, 66 (Doc. 1 ¶¶ 14, 20).  The City's policy
did not allow officers to inquire into an individual arrestee's ability to pay the
preset bail amount, and did not permit officers to deviate from the requirement that
arrestees pay that amount in full before they would be entitled to release.  A. 65-66
(Doc. 1 ¶¶ 19-21).  An indigent arrestee's only way to obtain release was to wait in
jail to see a judge at the next Monday court session.  A.65-66 (Doc. 1 ¶¶ 19-22).

As required by the City's policy, Walker was informed after being
transported to jail "that [he] had to pay a $160 cash bond on [his] charge or else he
would be kept in jail."  A.83 (Doc. 4-1 ¶ 3).  Walker could not afford to pay that
amount.  A.83 (Doc. 4-1 ¶ 5).  Because the City's policy made no provision for
accommodating indigent arrestees, A.66 (Doc. 1 ¶ 20), Walker was kept in jail to
wait for his municipal court date eleven days away, A.64-65 (Doc. 1 ¶¶ 12-15).

## B.    District Court Proceedings and Preliminary Injunction

Walker filed this action on September 8, 2015, while he was still in jail
because he could not afford his bail amount.  A.61 (Doc. 1).  He filed

contemporaneous motions for a preliminary injunction against the City's bail policy, A.79 (Doc. 4), and for class certification, A.119 (Doc. 10). On September 9, the City released Walker from its custody on an own-recognizance bond "by agreement of counsel." A.260 (Doc. 29 at 2); A.288 (Doc. 29-2).

Nearly three months after Walker filed the motion for a preliminary injunction,[3] the City filed an opposition brief with the district court and attached a new "standing bail order" that modified the City's bail procedures. A.292 (Doc. 29-5). The order was signed nine days before the City's deadline to respond to the motion. A.298 (Doc. 29-5 at 7). The revised procedures were largely the same as those in effect when Walker filed his complaint. The standing order "re-adopted and re-affirmed the written and established schedule of secured bail" under which Walker was kept in jail. A.261 (Doc. 29 at 3). As before, the bail amounts "represent[ed] the expected fine with applicable surcharges for all offenses charged . . . for disposition should the accused later enter a plea, or be found guilty following a bench trial." A.295 (Doc. 29-5 at 4). The standing order also reaffirmed the City's policy of offering "speedy and convenient release for those

---

[3] Under the district court's local rules, the City initially had up to 14 days to respond to Walker's motion for a preliminary injunction. N.D. Ga. L.R. 7.1(C). Walker consented to several time extensions that ultimately allowed the City to file its response brief on or before December 2, 2015. Doc. 16; Doc. 18; Doc. 20.

who have no difficulty" paying their bail amounts, A.294 (Doc. 29-5 at 3) (citation omitted), while continuing to detain those who could not pay.

The principal difference between the original and revised versions of the policy was that the revised policy detained misdemeanor arrestees who could not pay money bail for a period of up to two days, instead of seven days, before holding a hearing where indigent arrestees could request recognizance release. A.296-97 (Doc. 29-5 at 5-6). The revised version of the policy also released anyone arrested for violating a City ordinance immediately upon signing an unsecured recognizance bond. A.297-98 (Doc. 29-5 at 6-7).[4]

The parties did not dispute the material facts below. There was no dispute that, at the time Walker filed his complaint, arrestees who could pay the ultimate fine and fees were released immediately, while arrestees who could not pay were jailed for up to one week. There was no dispute that City officials made no inquiry into an arrestee's ability to pay during the period—up to seven days—between arrest and a first appearance before the municipal court. There was no dispute that the modified policy likewise released those who could pay immediately but

---

[4] The modified policy permits an accused to provide a driver's license as collateral for any bail "as provided for by O.C.G.A. § 17-6-2." A.294 (Doc. 29-5 at 3). That statute provides that a law enforcement officer may accept a license as collateral only "after the individual has been incarcerated for not less than five days." O.C.G.A. § 17-6-2(a)(1). The City's revised policy does not provide for shortening of the five-day waiting period.

detained those who could not pay for two days before releasing them automatically anyway.  And there was no dispute that Walker, who is indigent and disabled, would not have been detained if he had been able to pay $160 the day he was arrested.

The district court issued a preliminary injunction and 74-page order on January 28, 2016.  A.529 (Doc. 40).  Citing numerous federal and state cases, A.576-84 (Doc. 40 at 48-56), the court held that the government violates the Fourteenth Amendment when it declares all arrestees immediately eligible for release upon payment and detains only those who cannot immediately pay without any inquiry into their ability to do so.  A.577, 584 (Doc. 40 at 49, 56).  The court applied that rule and held that "[t]he bail policy under which [Walker] was arrested clearly is unconstitutional."  A.584 (Doc. 40 at 56).  The district court also reviewed the revised bail policy and found that it "g[ave] rise to some of the same concerns as" the original policy.  A.586 (Doc. 40 at 58).  Accordingly, the district court ordered the City to either "implement post-arrest procedures that comply with the Constitution" or offer misdemeanor arrestees release "on their own recognizance or on an unsecured bond . . . ."  A.601 (Doc. 40 at 73).  In a separate order entered contemporaneously with the injunction, the district court granted Walker's motion for class certification.  A.604 (Doc. 41).  This appeal follows.

## STANDARD OF REVIEW

On appeal, a district court's decision to grant a preliminary injunction is reviewed for abuse of discretion. *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012); *Cumulus Media v. Clear Channel Comm.*, 304 F.3d 1167, 1171 (11th Cir. 2002) ("[Judgments] about the viability of a plaintiff's claims and the balancing of equities and the public interest[] are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them.").

To grant a preliminary injunction, a district court must find that the movant has a substantial likelihood of success on the merits; the movant will suffer irreparable injury absent injunction; the threatened injury to the movant outweighs the damage an injunction might cause the non-movant; and the injunction would not be adverse to the public interest. *GeorgiaCarry.Org v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

I.     The City of Calhoun's post-arrest policy is a novel variation on an old theme that for half a century has been repudiated by courts as incompatible with the Fourteenth Amendment.  Like any jurisdiction, the City of Calhoun has the power to detain people upon determinations of probable cause that they committed crimes, and it also has the power to set conditions of release sufficient to ensure

9

attendance at court proceedings.  But those powers do not authorize the City to establish a dual-track system that short-circuits the detention for a preferred class of people while requiring the indigent to wait in jail up to a week or more for a judicial proceeding.   Either the City can detain all arrestees until the commencement of appropriate legal proceedings, or it can provide an evenhanded system of release that is equally accessible to the poor and the wealthy.  The City offers no plausible reason to justify its bail policy given binding precedent barring wealth-based jailing.

Nor does the City identify a valid obstacle to enjoining that policy.  The City's mid-litigation policy shift—which shortened the time of detention for indigents from seven days to two—did not unambiguously terminate the original policy that was in place when this case was filed.  Therefore, the district court had jurisdiction to enjoin both the original and the revised policies.

Second, nothing about the order below conflicts with Georgia law.  The statute invoked by the City, O.C.G.A. § 17-6-1, authorizes bail schedules but explicitly provides that bail need not be secured and allows for a variety of other alternatives, including release on recognizance or non-financial conditions.  There was no need for the district court to address the constitutionality of O.C.G.A. § 17-6-1, because accommodating indigent people is in harmony with the statute.

10

Third, this case does not permit abstention. The injunction addresses the period after arrest when there is no ongoing or adequate state court proceeding in which an arrestee could raise the claim in question, and it does not involve a legal theory that could be used in defense of prosecution. For similar reasons, and because the injunction does not require the City to release anyone, Walker was not required or permitted to bring his claim by way of habeas corpus.

Finally, the policy challenged in this case is the City's official policy and the district court properly enjoined the City from enforcing it. The district court held that the City's role as custodian of all arrestees empowered it to implement procedures to avoid detaining only the indigent, and the City has abandoned any challenge to that clearly correct holding. In addition, Georgia law and the City's charter allow the City to regulate bail and post-arrest release procedures by ordinance—as numerous Georgia municipalities including Calhoun have done. And Georgia law treats municipal judges as local rather than state officials when they make administrative policies. In any event, federal courts have the power to order government actors, whether they be local, state, or federal, to cease violations of federal rights even if they are following a policy required by state law or a court order.

II.    The district court did not abuse its discretion in finding that Walker satisfied the three equitable requirements for a preliminary injunction. It is well

established that unlawful incarceration constitutes irreparable harm.  And the concrete harm to indigent traffic and misdemeanor arrestees clearly exceeds the harm that the district court's narrow injunction would cause the City.  Indeed, the City proffered no evidence of how it would be harmed by an injunction, and its generalized objections about practical and public-safety concerns failed to identify any consequence not already present in its system of releasing all arrestees who prepay their fines.  The injunction therefore promotes rather than harms the public interest.  It prevents further violations of arrestees' Fourteenth Amendment rights, preserves the City's authority to detain people for noneconomic reasons, and does not allow any harm that the City's own policies did not already allow.

## ARGUMENT

### I.    The District Court Correctly Determined That Walker Is Likely to Succeed on the Merits.

"[I]n reviewing the district court's grant of the preliminary injunction," this Court "do[es] not resolve the merits of the constitutional claim, but instead address[es] whether the district court abused its discretion in concluding that [the plaintiff] is substantially likely to succeed in establishing [a violation of his] rights."  *See Lebron v. Sec'y, Fla. Dep't of Children and Families*, 710 F.3d 1202, 1206 (11th Cir. 2013). "If the underlying constitutional question is close, therefore, [a court] should uphold the injunction and remand for trial on the merits."  *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664-65 (2004).

12

The district court correctly identified numerous decisions supporting Walker's claim and found Walker likely to prevail on the merits. Finding no valid obstacle to enjoining the City of Calhoun's unconstitutional detention policy, the district court entered narrow relief tailored to ending the constitutional violation it identified. Its judgment is correct in all respects and should be affirmed.

**A.**     **The City Violates the Fourteenth Amendment by Detaining People for up to Seven Days, or Two Days Under Its Revised Policy, Solely for Failing to Pay a Preset Amount of Money.**

        **1.**     **Keeping people in jail only because they are indigent violates equal protection and due process principles.**

The rule against wealth-based privileges in the criminal justice system is fundamental and "the passage of time has heightened rather than weakened the attempts to mitigate the disparate treatment of indigents in the criminal process." *Williams v. Illinois*, 399 U.S. 235, 241 (1970) ("[T]he Court has had frequent occasion to reaffirm allegiance to the basic command that justice be applied equally to all persons."). The rule has special force when the government seeks to keep a person in custody because of inability to make a payment. *See Bearden v. Georgia*, 461 U.S. 660, 664-66 (1983) (collecting cases).[5]

---

[5] The City contends that Walker "has never specified what cause of action he is traveling under." Appellant's Br. 7. As discussed herein, Walker's legal claim rests on the established prohibition against jailing indigent people solely for failing to pay money—a prohibition that the Supreme Court has repeatedly reaffirmed while declining to "pigeonhole" it in either a due process or equal protection framework. *See Bearden v. Georgia*, 461 U.S. 660, 666 (1983); *id.* at 665 ("Due

In every modern case that has presented the issue, the Supreme Court has struck down practices that keep the poor in jail solely because they cannot pay money. In *Williams v. Illinois*, a state statute required a misdemeanant who failed to pay court-ordered fines and court costs to be kept in jail beyond the term of his 12-month sentence. 399 U.S. at 237. The Supreme Court held that the practice violated the Equal Protection Clause by "visit[ing] different consequences on two categories of persons" and imprisoning "those without the requisite resources to satisfy the money portion of the judgment." *Id*. at 242.

The Supreme Court extended that holding in *Tate v. Short*, where a statute punished traffic offenses by fines and allowed unpaid fines to be converted to imprisonment "at the rate of five dollars for each day [in jail]." 401 U.S. 395, 396 (1971). Again applying the Equal Protection Clause, the Supreme Court observed that the fine-conversion statute resulted in "precisely the same unconstitutional discrimination" as in *Williams* because the defendant "was subjected to imprisonment solely because of his indigency." *Id.* at 397-98. The Court held that "the Constitution prohibits the State from imposing a fine as a sentence and then

---

process and equal protection principles converge in the Court's analysis in these cases."); *cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2602-03 (2015) ("The Due Process Clause and the Equal Protection Clause are connected in a profound way . . . [and] may converge in the identification and definition of [a] right."). Walker explained the nature of his claim in many pages of district court briefing, and the district court clearly and correctly understood it.

automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Id.* at 398.

The former Fifth Circuit applied the same principle to novel facts in *Frazier v. Jordan*, 457 F.2d 726 (5th Cir. 1972).[6]  There, defendants in a Georgia municipal court were convicted of violating local ordinances and punished with "alternative sentences of a $17 fine or 13 days in jail for each violation." *Id.* at 727.  The sentencing practice created "two disparately treated classes: those who can satisfy a fine immediately upon its levy, and those who can pay only over a period of time, if then." *Id.* at 728.  Because the municipal court's practice created a system where "[t]hose with means avoid imprisonment" while "the indigent cannot escape imprisonment," *Frazier* held that the practice violated the Equal Protection Clause.  *Id.* at 728-29; *see also Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir. 1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), *vacated as moot*, 439 U.S. 1041 (1978).

The Supreme Court's next guidance in this area came in *Bearden v. Georgia*, where a convicted felon on probation challenged a state court's revocation of his probation sentence for failure to pay $750 in fines and restitution.

---

[6] Decisions of the former Fifth Circuit rendered before October 1, 1981, are binding unless overruled by the Supreme Court or this Court sitting en banc. *Bonner v. City of Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc).

461 U.S. 660 at 662.  The Court cited *Williams* and *Tate* for the rule that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it."  *Id.* at 667-68.  Applying that rule to the probation context, the Court held that to "deprive [a] probationer of his conditional freedom simply because, through no fault of his own he cannot pay [a] fine . . . would be contrary to the fundamental fairness required by the Fourteenth Amendment."  *Id.* at 672-73.  In describing the constitutional source of the right at stake, the Court revisited the equal protection rationale of earlier cases and rejected a "pigeonhole analysis," explaining that "[d]ue process and equal protection principles converge" in the Constitution's proscription against jailing an indigent person solely for failure to pay.  *Id.* at 665-66.[7]

### 2.    The rule against wealth-based detention applies to money bail regimes.

In finding that Walker has a substantial likelihood of success on the merits, the district court looked to *Williams*, *Tate*, and *Bearden*—all of which involved jailing of convicted criminal defendants—and held that the rule applied in those

---

[7] The Supreme Court addressed similar issues in *Turner v. Rogers*, 131 S. Ct. 2507, 2519–20 (2011), and articulated the minimum procedural safeguards that a state must provide before jailing an alleged contemnor for failing to comply with a child support order.  Among other requirements, there must be an "express finding by the court that the defendant has the ability to pay" before the defendant may be jailed for nonpayment of a financial condition.  *Id*. at 2519.

cases is equally applicable to money bail regimes that detain people accused of traffic and misdemeanor crimes.    A.576-78 (Doc. 40 at 48-50).    The City acknowledges the "litany of cases" that the district court relied on, Appellant's Br. 46, but argues that the cases are "inapposite" to jailing people for their inability to pay pretrial money bail.    Appellant's Br. 46.    In fact, the law of this Circuit establishes that the precedent dismissed by the City as "inapposite" applies with "broader effects and constitutional implications" in the case of bail regimes, where the rights at stake for pretrial arrestees are even more significant because their liberty has not been diminished by conviction.    *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (en banc) (applying *Williams* and *Tate* to "problems concerning pretrial bail").

The City says that *Pugh v. Rainwater*, 572 F.2d at 1053, "expressly endorses" secured bail schemes like the City's.    Appellant's Br. 31.    But *Rainwater* does not help the City.    In *Rainwater*, the former Fifth Circuit recognized that "[u]tilization of a master bond schedule" may infringe on the same "due process and equal protection requirements" that the Supreme Court announced in *Williams* and its progeny.    572 F.2d at 1057.    At issue in *Rainwater* was a Florida court rule that enumerated several forms of post-arrest release, including money bail.    *Id.* at 1055.    A panel of the Fifth Circuit had struck down the Florida rule on its face because it did not include "a presumption against money bail and in favor of those

forms of release which do not condition pretrial freedom on an ability to pay." 557

F.2d 1189, 1202 (5th Cir. 1977).

Like the panel, the en banc Court recognized that, "in the case of an

indigent, whose appearance at trial could reasonably be assured by one of the

alternate forms of release, pretrial confinement for inability to post money bail

would constitute imposition of an excessive restraint." *Rainwater*, 572 F.2d at

1058. But it vacated the panel's facial invalidation of the rule because it found that

the text of the rule could be interpreted to address the panel's concerns. *Id.* at

1058.

Although the Florida rule lacked an express presumption against money bail

for indigents, the Court "doubt[ed]" that Florida's "failure to express such a

presumption necessarily impute[d] to it a design thus to circumvent constitutional

requirements." *Id.* Instead, it assumed that Florida courts would enforce the rule

in a constitutional manner instead of impermissibly requiring indigent people to

pay for their release. *Id.* As the Court explained, "The incarceration of those who

cannot [afford a cash payment], without meaningful consideration of other possible

alternatives, infringes on both due process and equal protection requirements." *Id*.

at 1057.

State courts to consider the question have shared and given effect to

*Rainwater*'s condemnation of the "automatic setting of money bails" in

misdemeanor cases. *Id.* at 1058. In *State v. Blake*, 642 So. 2d 959, 968 (Ala. 1994), the Alabama Supreme Court struck down a statute that operated in a manner almost identical to the policy challenged here. The statute allowed for indigent arrestees to be held for 72 hours if they could not afford money bail payments to secure their release prior to their first appearance. *Id.* The Court held:

> [A]n indigent defendant charged with a relatively minor misdemeanor who cannot obtain release by cash bail, a bail bond, or property bail, must remain incarcerated for a minimum of three days, and perhaps longer, before being able to obtain [recognizance release]. We conclude that, as written, article VII of the Act violates an indigent defendant's equal protection rights guaranteed by the United States Constitution . . . .

*Id.* (quotations removed). In *Blake*, the lower Alabama court had expressed concern at post-arrest detention based solely on money for petty offenses:

> If this defendant has $60 cash to pay a bondsman, he walks out of the jail as soon as he is printed and photographed . . . . Absent property or money, the defendant must wait 72 hours . . . . Putting liberty on a cash basis was never intended by the founding fathers as the basis for release pending trial.

*Id.* at 966.[8] Federal district courts reviewing similarly inflexible wealth-based bail regimes in the misdemeanor context have reached similar conclusions.[9]

---

[8] *See also Lee v. Lawson*, 375 So. 2d 1019, 1023 (Miss. 1979) ("A consideration of the equal protection and due process rights of indigent pretrial detainees leads us to the inescapable conclusion that a bail system based on monetary bail alone would be unconstitutional."); *Robertson v. Goldman*, 369 S.E.2d 888, 891 (W.Va. 1988) ("[If] the appellant was placed in jail because he was an indigent and could not furnish [bond] while a person who is not an indigent can avoid being placed in jail

3.    **The City's bail regime violates the constitutional rights of indigent traffic-offense and misdemeanor arrestees by providing a mechanism for immediate release to people who can pay, but not the poor.**

The district court correctly held that the City's bail policy "clearly is unconstitutional" under the foregoing precedents. A.584 (Doc. 40 at 56). Unlike the court rule at issue in *Rainwater*, which could be construed to accommodate the indigent, 572 F.2d at 1058, the City's policy imposes monetary conditions of release as a blanket rule with the "inevitable result" of detaining only the poor, *see id.*

Under the City's policy, all traffic and misdemeanor arrestees who can pay have an entitlement to "speedy and convenient release" from jail without the need for further proceedings. A.294 (Doc. 29-5 at 3). In administering that benefit, the City does not consider good character, community ties, or any other factor weighing against preventative detention. Nor does the City deny the benefit to people with violent backgrounds, previous failures to appear in court, or present states of intoxication. Those factors are irrelevant because, under the City's policy,

---

by merely furnishing the bond required, he has been denied equal protection of the law.") (internal quotation marks omitted).

[9] *See, e.g.*, *Rodriguez v. Providence Cmty. Corr.*, No. 3:15-cv-1048, 2015 WL 9239821 (M.D. Tenn. Dec. 17, 2015) (enjoining a policy of detaining misdemeanor probationers who could not pay a predetermined bail); *Jones v. City of Clanton*, No. 2:15-cv-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015) (declaring secured money bail unconstitutional without an inquiry into ability to pay).

the sole measure of fitness for "speedy and convenient release" is one's present ability to tender money or property in an amount based solely on "the expected fine with applicable surcharges for all offenses charged." A.295 (Doc. 29-5 at 4).

When the City arrested Maurice Walker, he could not take advantage of the prompt release that the City offered arrestees with means. At the time, Walker lived with his sister, was disabled, owned no property, and had no income apart from a social security disability check that his sister received and managed for him. A.83 (Doc. 4-1 ¶ 4). As with other indigent arrestees, the only way for Walker to obtain release was to wait in jail until the next municipal court date, which normally took up to a week. A.347 (Doc. 31 ¶ 14) (stating municipal court sessions held on Mondays). In the meantime, Walker "was subjected to imprisonment solely because of his indigency." *Tate*, 401 U.S. at 398.

The City does not explain how its practice of detaining Walker and other arrestees solely for failing to pay—and without any inquiry into their ability to do so—can be harmonized with the longstanding prohibition on jailing people for their indigence. Instead, the City focuses on its revised policy and argues that detention of the indigent for up to two days must be tolerable because the Fourth Amendment allows a government to hold *all arrestees* for up to 48 hours without bond before a probable cause hearing. Appellant's Br. 52-53; *see also* Br. for Amici Curiae Am. Bail Coalition et al. 27 (same). But the Equal Protection Clause

21

protects against the *distinct* harm caused when the City offers immediate release to people with money while denying it to those without. *See, e.g.*, *Halbert v. Michigan*, 545 U.S. 605, 610 (2005) ("The Federal Constitution imposes on the States no obligation to provide appellate review of criminal convictions. Having provided such an avenue, however, a State may not 'bolt the door to equal justice' to indigent defendants." (internal citations omitted)); *see also Rainwater*, 557 F.2d at 1199, 1201-02, *vacated on other grounds*, 572 F.2d 1053. Regardless of its power to detain all arrestees, the City cannot exercise that power in a way that grants the privilege of avoiding detention only to those who can "forthwith pay" the expected fine and surcharges, while refusing to offer an equivalent benefit to the indigent. *Tate*, 401 U.S. at 398.

Based on its mistaken view that *Williams*, *Tate*, and *Bearden* are "inapposite" to this case, Appellant's Br. 46, the City attempts to defend its bail policy with a traditional equal-protection analysis. The City errs, however, in arguing that its detention procedures should receive rational-basis review. Appellant's Br. 41-44. Properly understood, the City's procedures are subject to strict scrutiny because they infringe an indigent person's right to pretrial liberty. *See Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) ("[A] statutory classification based upon suspect criteria or affecting 'fundamental rights' will encounter equal protection difficulties unless justified by a compelling governmental interest.").

22

In *United States v. Salerno*, 481 U.S. 739, 750 (1987), the Supreme Court recognized that pretrial liberty is a "fundamental" right.[10]  In evaluating the federal Bail Reform Act under heightened scrutiny, the Court upheld the statute's restrictions on bail because they addressed a "compelling" and "overwhelming" interest of preventing pretrial crimes by affecting only those defendants charged with "extremely serious offenses" and whom "Congress specifically found" to pose an "acute problem."  *Salerno*, 481 U.S. at 750; *see also id.* at 742, 750-51 (noting statute contained extensive safeguards including an adversarial hearing, representation by counsel, and written findings of dangerousness before person could be detained prior to trial).  Recognizing the fundamental nature of the right involved, courts apply *Salerno*'s strict scrutiny test when evaluating burdens on pretrial liberty in a variety of contexts.  *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc) (applying strict scrutiny to review burden under Due Process Clause); *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009) (applying strict scrutiny to review burden under Eighth Amendment).

---

[10] *See also United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990) (holding that release prior to trial is a "vital liberty interest"); *Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

Because a fundamental right is involved, strict scrutiny also applies when differential burdens on pretrial release are reviewed under the Equal Protection Clause. *See Schilb*, 404 U.S. at 365.[11]  Therefore, the City must establish that its different treatment of indigent arrestees is narrowly tailored to further a compelling interest.  In the context of minor traffic and misdemeanor arrestees—all of whom the City has deemed eligible for immediate release—it is simply not rational, let alone narrowly tailored, to keep only the poor in jail when there are alternatives available and when the same arrestees for the same offenses can achieve immediate release by paying small sums to the City.

Accordingly, the level of scrutiny is not pivotal in this case; the policy would still fail if rationality were the touchstone.[12]  The City argues that its policy furthers legitimate goals of securing an arrestee's presence at trial, Appellant's Br. 43, and protecting the community, *id.* at 43-44.  But the City's policy "hardly offers an effective method" of achieving those interests.  *See Plyler v. Doe*, 457 U.S. 202, 228 (1982).  The policy requires people who cannot pay small amounts—$160 in Walker's case—to sit in jail up to seven days until they see a

---

[11]  Because strict scrutiny applies, the burden is on the City to establish a compelling interest and narrow tailoring at the preliminary injunction stage.  *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

[12]  *See Blake*, 642 So. 2d at 968 (invalidating similar scheme as not rationally related to any legitimate government interest).

judge and are released on their own recognizance anyway.  In the meantime, the

City automatically releases everyone who pays preset amounts of money without

considering previous failures to appear, community ties, financial resources, or

other factors that bear on whether the amount set by the bail schedule provides

sufficient incentive for the accused to appear in court.  Nor does the policy prevent

crime.  The only characteristic tested by the City's policy is blunt ability to pay, a

trait with no rational relationship to that goal.  *Cf. Bearden*, 461 U.S. at 671

(rejecting the proposition that "poverty by itself indicates [a defendant] may

commit crimes in the future"); *Blake*, 642 So. 2d at 968 (holding bail regime

irrational where it allowed felony defendants "who may potentially pose a great

threat to community safety" to obtain immediate release while requiring indigent

misdemeanor arrestees to "remain incarcerated for a minimum of three days").

The City's revised policy is further removed from any legitimate interest.

The revised policy allows all ordinance violators to be released on an unsecured

bond,[13] A.297-98 (Doc. 29-5 at 6-7), provides that anyone earning less than 100

---

[13] The City of Calhoun maintains a fluid distinction between misdemeanors and ordinance violations.  Its code of ordinances uses the term "misdemeanor" to describe ordinance violations and designates certain offenses "misdemeanor by ordinance."  Calhoun Code § 1-7(a)(1); *see, e.g.*, *id.* at §§ 10-38, 22-232(b), 22-321(a), 30-6, 50-75, 94-83.  In addition, the City prohibits by ordinance all state-law misdemeanors when committed within the City's jurisdiction.  Calhoun Code § 62-1.  Therefore, whether an accused misdemeanant is entitled to unsecured bond is determined chiefly by whether the arresting officer charges the offense under state statute or the corresponding ordinance.

percent of the federal poverty guidelines is entitled to automatic release after waiting up to two days in jail, *id.* at 20-21, and releases everyone automatically after two days without a hearing, *id.* These exceptions undercut any legitimate rationale for the City's policy and can be better explained as a litigation strategy to preserve the policy's true design: pressuring arrestees into prepaying "the expected fine[s] with applicable surcharges for all offenses." A.295 (Doc. 29-5 at 4). Indeed, the City's bail schedule candidly designates bail money "for disposition should the accused later enter a plea, or be found guilty following a bench trial." *Id.* But that punitive aim is not legitimate as applied to people accused but not yet convicted of crimes. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[A] detainee may not be punished prior to an adjudication of guilt . . . .").

The result is a system that harms poor people while having no beneficial impact on public safety. No precedent of this Court or the Supreme Court supports it. The district court applied relevant precedent and reached the only sound result.

**B.   The District Court's Injunction Narrowly and Appropriately Corrects the Constitutional Violations.**

Walker's claim challenges a particular unconstitutional defect in the City's procedures that allows many traffic and misdemeanor arrestees to enjoy immediate release but provides no equivalent mechanism for those who are unable to pay. Misconstruing the limited nature of that claim, the City and its amici contend that Walker's success on the merits would "necessitate[] the immediate release of

26

[arrestees] without assessing any individualized qualifications, including indigency." Appellant's Br. 56; Br. for Amici Curiae Am. Bail Coalition et al. 4 ("[O]n plaintiff's view the City had no choice but to release him *immediately* once he said he could not post bail under the bail schedule . . . ."). In reality, Walker's claim and requested relief are much narrower than that.

Walker's claim can be resolved in a number of different ways that would allow the City to exercise discretion over the release of arrestees. Accordingly, when Walker moved for a preliminary injunction, he proposed that the district court order the City generally "to implement post-arrest procedures that comply with the Constitution," A.84 (Doc. 4-2 at 1) (proposed order), and—only if the City failed to do so—that the City be ordered to offer arrestees release "on their own recognizance or on an unsecured bond in a manner otherwise consistent with state and federal law," A.84-85 (Doc. 4-2 at 1-2). The district court's order contained similar language. A.601-02 (Doc. 40 at 73-74). Walker did not ask the district court to determine in the first instance that he or any other arrestee is indigent and release him outright, and the district court did not decide that Walker or any other arrestee was entitled to immediate release. It left that determination to the City.

Under the district court's injunction, the City can remedy its system by detaining all arrestees until a hearing at which the municipal court would inquire

into and make findings concerning an individual's ability to pay any bail and impose non-financial alternatives to secured bail. Alternatively, the City could continue immediately releasing those who can pay, as long as it accommodates those unable to do so. For example, the City could provide arrestees a standard form to attest under penalty of perjury to their finances and inability to pay the scheduled amount. Numerous Georgia municipalities already entrust law enforcement officers and other officials to make commonsense judgments about recognizance release in misdemeanor cases, often guided by enacted standards. *See infra.* at 48-50. Nothing in Georgia law prevents the City from allowing its officials to administer recognizance release for traffic and misdemeanor arrestees attesting under the threat of future prosecution to their inability to pay. Similarly, the City could simply provide own-recognizance or unsecured bonds—with or without appropriate non-financial conditions—to all traffic and misdemeanor arrestees.[14] The district court's order did not require any particular action. It simply identified the constitutional violation and left the City free to implement its remedy of choice.

---

[14] Under its revised policy, the City already releases accused ordinance violators on an unsecured bond, regardless of their ability to pay. A.298 (Doc. 29-5 at 7).

### C. There Is No Procedural or Jurisdictional Impediment to Injunctive Relief.

The City nonetheless mischaracterizes the injunction and lodges assorted procedural objections that the district court rightly rejected. On appeal, the City adds one more, arguing that the district court was required to decline jurisdiction over this case. Fairly read, the injunction is an appropriate and necessary exercise of the district court's jurisdiction that does not conflict with established limitations on injunctive relief.

### 1. The challenge to the original policy is not moot.

The City of Calhoun has applied two versions of its policy during the course of this litigation—the original policy requiring its arrestees to wait up to seven days in jail for a hearing, and a modified version of the policy requiring a wait of up to two days before either a hearing or automatic release of the indigent. The district court, finding that each version of the policy presented a live controversy, enjoined them both. A.587-90 (Doc. 40 at 59-62).

The City concedes that there is a live dispute between the parties with respect to the revised version of the policy. *See, e.g.*, Appellant's Br. 70 (asking Court to "hold that . . . the City's Standing Bail Order and use of a bond schedule are constitutional"). But the City asserts in passing that the district court erred by finding that the original policy also presented a live controversy. Appellant's Br. 67. The City has abandoned any challenge to that ruling by raising the issue "in a

perfunctory manner without supporting arguments and authority." *See Sapuppo v.*

*Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).[15]   In any event,

assuming it bears on the outcome, the district court's judgment should be affirmed.

As the district court recognized, A.588 (Doc. 40 at 60), a defendant cannot

defeat jurisdiction by claiming a sudden policy shift.  The Supreme Court has held

that "voluntary cessation of a challenged practice rarely moots a federal case."

*City News and Novelty v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001); *see*

*Knox v. Serv. Employees Int'l Union*, 132 S. Ct. 2277, 2287 (2012); *Parents*

*Involved v. Seattle Sch. Dist.*, 551 U.S. 701, 719 (2007).

A defendant who asserts mootness on the basis of voluntary cessation "bears

the formidable burden of showing that it is absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur."   *Friends of the*

*Earth, Inc. v. Laidlaw Environmental Serv. (TOC), Inc.*, 528 U.S. 167, 190 (2000);

*Parents Involved*, 551 U.S. at 719 (holding that municipal defendant failed to meet

"heavy burden" to show mootness).   "In keeping with these Supreme Court

decisions, this Court also employs this standard, even for government actors."  *Doe*

*v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014).  To determine whether voluntary

---

[15] The City's amici have attempted to remedy this failure, *see* Br. for Amici Curiae City of Attalla et al. 22-26, but "arguments raised only by amici may not be considered" in support of a party that failed to properly raise them. *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991).

cessation moots a case, courts consider whether the termination of the offending conduct was unambiguous, whether the change in conduct appears to be the result of substantial deliberation as opposed to an attempt to manipulate jurisdiction, and whether the government has consistently applied its new policy or adhered to a new course of conduct. *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531-32 (11th Cir. 2013).

The City does not come close to meeting its "heavy burden." In determining that the City failed to meet its burden, the district court explained that "when the government is the defendant, courts extend a reasonable presumption that government actors are unlikely to resume illegal activities." A.589 (Doc. 40 at 61).[16] However, observing that "the new Standing [Bail] Order presents some of the same concerns that arose from the former bail policy," the district court found that "it [was] not absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur." A.589-90 (Doc. 40 at 61-62) (quoting *Cook v. Bennett*, 792 F.3d 1294, 1300 (11th Cir. 2015)).

---

[16] The Supreme Court has not applied such a "rebuttable presumption" in favor of government actors in voluntary cessation cases and holds government defendants to the same standard as other defendants. *See Parents Involved*, 551 U.S. at 719. Even courts that have applied such a presumption have found it rebutted when the government defendant still maintains the constitutionality of its original actions. *See, e.g.*, *Rich*, 716 F.3d at 532.

The district court had ample grounds for believing that the City had not unequivocally abandoned the original policy.    The City announced the modifications to its policy three months after Walker moved for a preliminary injunction.[17]    Even then, the City merely shortened the maximum time that a misdemeanor arrestee could be detained, leaving "concerns that arose from the former bail policy" unresolved.  A.590 (Doc. 40 at 62).  Thus, the policy change did not "appear to be the result of any 'substantial deliberation' that would indicate a sincere change in position rather than an attempt to avoid the issuance of an injunction."  *See Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011); *Harrell v. The Florida Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010) (noting that "cessation that occurs 'late in the game' will make a court 'more skeptical of voluntary changes that have been made'").  "This timing suggests a change was made simply to deprive the District Court of jurisdiction."  *Doe*, 747 F.3d at 1325 (holding case not moot where defendant "suddenly changed its position days before [plaintiff's] trial was set to begin"); *Rich*, 716 F.3d at 532 (holding challenge not moot when government

---

[17] The standing order was signed nine days before the City's deadline to respond to the motion, which had been extended twice with Walker's consent.  *Compare* A.298 (Doc. 29-5 at 7) (showing revised policy dated November 23, 2015), *with* Doc. 20 at 2 (showing December 2, 2015, deadline to respond to motion).

defendant "announced that it was going to change its policy only after [plaintiff] filed his counseled brief").

Most importantly, the City has "vigorously defend[ed] the constitutionality" of its policy throughout this litigation.[18]  *See Parents Involved*, 551 U.S. at 719 (declining to find mootness where "the [defendant] vigorously defends the constitutionality" of its policy).  The City's position on the issues in this case and failure to provide assurances that future litigation will not be necessary confirm that the City "has clearly not met" its burden.  *Id.*; *see Knox*, 132 S. Ct. at 2287 ("[S]ince the union continues to defend the legality of the Political Fight–Back fee, it is not clear why the union would necessarily refrain from collecting similar fees in the future."); *Rich*, 716 F.3d at 532 ("Florida 'continue[s] to press on appeal that the voluntarily ceased conduct should be declared constitutional' and has 'never promised not to resume the prior practice.'" (quoting *Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833-34 (11th Cir. 1989))).

### 2.    The injunction is consistent with O.C.G.A. § 17-6-1.

The City argues that the district court erred "by not conducting any constitutional analysis of O.C.G.A. § 17-6-1"—an analysis that the City asserts

---

[18] *See, e.g.*, Appellant's Br. 16 ("Plaintiff has not shown a substantial likelihood of establishing a constitutional violation"); A.267 (Doc. 29 at 9) ("Plaintiff does not possess a substantial likelihood of success on the merits because required constitutional protections are already provided by state law.").

would have required invalidating the statute if Walker prevailed on his legal claim. Appellant's Br. 17-18.   But courts have a duty to uphold statutes that can reasonably be construed to avoid constitutional doubt.   *See, e.g.*, *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1271 (11th Cir. 2014) (collecting cases). Consistent with that duty, the district court examined the statute and found it "abundantly clear" that Walker's challenge to the City's bail policy "is not challenging the requirements or provisions of O.C.G.A. § 17-6-1 or bail schedules per se."  A.595 (Doc. 40 at 67).[19]

The district court correctly found Walker's claim consistent with the statute. First, O.C.G.A. § 17-6-1(f)(1) provides that a court may "establish a schedule of bails and unless otherwise ordered by the judge of any court, a person charged with committing any offense shall be released from custody upon posting bail as fixed in the schedule."   Nothing in the statute requires the City to demand up-front payment of money before release.  In fact, the statute's text suggests the opposite. It provides that "the term 'bail' shall include the releasing of a person on such person's own recognizance" in all non-felony cases.  O.C.G.A. § 17-6-1(i).  If anything, the statute's express provision for own-recognizance bonds suggests that invalidating the City's cash-or-property system of bail will advance rather than

---

[19] Similarly, Walker's claim does not "draw[] into question" the constitutionality of a Georgia statute, and the district court was not required to allow the State of Georgia to intervene in the case. *See* 28 U.S.C. § 2403(b).

hinder the statute's purpose of ensuring prompt release when people are arrested for misdemeanors. *See* O.C.G.A. § 17-6-1(b)(1) ("[A]t no time . . . shall any person charged with a misdemeanor be refused bail."). The Georgia statute certainly does not require the City to maintain its system of keeping poor people in jail while setting free those who can pay.[20]

Second, Walker's claim and requested relief does not depend on outlawing bail schedules. A bail schedule may be appropriate as applied to people who have the ability to pay. Rather, the issue in this case is whether the City can keep a person in jail for a significant period of time—up to seven days under the policy enforced until shortly before the City's response to Walker's motion, and up to two days under the City's mid-litigation modifications—solely because he cannot pay a preset sum. Requiring the City to have a mechanism for releasing those who

---

[20] The City incorrectly asserts that the aim of this case is to require "*unsecured recognizance bonds*," which, the City claims, are "unauthorized" in Georgia. Appellant's Br. 16, 53, 67, 87. Walker has never insisted that the City cure its constitutional violations with any particular form of release. That said, nothing in Georgia law prevents the use of an unsecured bond, i.e., a written promise to pay the scheduled amount in the event of a failure to appear in court. The Uniform Municipal Court Rules allow for "reasonable conditions" of release, Ga. Unif. Muni. Ct. R. 18.3, and unsecured own-recognizance bonds are authorized, O.C.G.A. § 17-6-1(i). The City's own modified policy does exactly what the City now tells this Court is illegal under Georgia law. A.297-98 (Doc. 29-5 at 6-7) (providing that accused ordinance violators "shall be released on an unsecured appearance bond").

cannot pay if it chooses to use a secured bail schedule is consistent with Georgia's statutory regime.

Thus, the trial court's order does not call into question any aspect of O.C.G.A. § 17-6-1(f)(1). There was no need for it to do so because the statute was "subject to constitutional interpretation and application." *See Rainwater*, 572 F.2d at 1058 (upholding state rule concerning bail that was capable of being applied in constitutional manner).

### 3.    The injunction is consistent with *Younger*.

The City did not raise abstention in the district court but now claims that this case "fall[s] squarely within" the abstention doctrine announced in *Younger v. Harris*, 401 U.S. 37, 44 (1971). Appellant's Br. 23. However, *Younger* abstention requires three things: the potential for undue interference with an ongoing state court proceeding; an important state interest implicated by that proceeding; and an adequate opportunity to raise the relevant claim in that proceeding. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 433 n.12 (1982). None of those conditions is met here.

*Gerstein v. Pugh*, 420 U.S. 103, 108 n.9 (1975), controls this case and illustrates why the *Younger* factors are not met. In *Gerstein*, state detainees complained that they were being held in jail after arrest without a valid probable cause determination. *Id.* at 106-07. The Court held that the "claim for relief was

36

not barred by the equitable restrictions on federal intervention in state prosecutions" announced in *Younger* because the injunction sought "was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution."  *Id.* at 108 n.9.

Like the detention procedures challenged by the *Gerstein* plaintiffs, the unconstitutional post-arrest policies challenged in this case have nothing to do with the merits of any future criminal trial.  Although the challenged policy relates to bail procedures, bail—particularly under the predetermined schedule at issue here—is a matter wholly collateral to guilt or innocence.  *See Kesler v. State*, 291 S.E.2d 497, 503 (Ga. 1982) ("Normally the denial of bail before trial would be moot after conviction."); *Craft v. State*, 269 S.E.2d 490, 491 (Ga. Ct. App. 1980) ("At [a bail] hearing the court does not pass on the merits of the case and there is no determination of guilt or innocence, or even probable cause.").  An injunction addressed to those procedures is not "directed at [any] state prosecutions as such" and "could not prejudice the conduct of the trial on the merits" in any pending case.  *Gerstein*, 420 U.S. at 108 n.9.  Thus, Walker's claim addressed an issue "that could not be raised in defense of the criminal prosecution."  *Id.*; 17B Charles Alan Wright *et. al.*, *Federal Practice and Procedure* § 4252 (3d ed. 2016) (same).

Similarly, the injunction does not "implicate important state interests."

*Middlesex*, 457 U.S. at 432.  States undoubtedly have an interest in protecting the community and ensuring appearance in court.  But that interest is not affected by the injunction.  The City has already determined that every person arrested for a traffic or misdemeanor offense is eligible for immediate release upon payment of the expected fine and surcharges.  A.295 (Doc. 29-5 at 4).  And the City automatically releases every indigent, misdemeanor arrestee anyway after detaining them for two days.  A.296-97 (Doc. 29-5 at 5-6).  Public safety is not advanced by detaining only the indigent.  *Cf. Bearden*, 461 U.S. at 671 ("[T]he State cannot justify incarcerating [an otherwise innocent] probationer . . . by lumping him together with other poor persons and thereby classifying him as dangerous.").  Nothing about the injunction sought and entered in this case prevents the City from imposing reasonable non-financial release conditions to achieve its legitimate interests.  Whatever interest the City has in detaining only indigent arrestees while releasing everyone else cannot be important enough to warrant abstention.

Finally, and most significantly, there was no opportunity for Walker to raise his claim in the municipal court proceedings.  Walker's claim is that arrestees cannot be kept in jail (for seven days, under the original policy, or for two days, under the revised policy) solely because they cannot pay a predetermined amount of money set without inquiry into their ability to pay.  Under the City's view,

Walker had to endure the entire harm that he alleged was unconstitutional, then somehow "litigate his federal constitutional claims" in the municipal court after he had suffered the constitutional violation.  Appellant's Br. 23.  By then, "no remedy would exist," because the period of incarceration that he challenges was transitory and "would have ended as of the time of" his first opportunity to address a judge. *See Pugh v. Rainwater*, 483 F.2d 778, 782 (5th Cir. 1973) ("If these plaintiffs were barred by *Younger* from this forum, what relief might they obtain in their state court trials?"), *aff'd in part, rev'd in part sub nom Gerstein*, 420 U.S. 103.  Indeed, the City's lack of any ability-to-pay inquiry or opportunity for release before seeing a judge is the gravamen of Walker's claim.  Just as in *Gerstein,* because arrestees have already suffered the constitutional violation and irreparable harm that they wished to prevent before they are brought to court to complain about it, there is no "adequate opportunity in the state proceedings to raise constitutional challenges" to its procedures.  *Middlesex*, 457 U.S. at 432; *see Pompey v. Broward Cty.*, 95 F.3d 1543, 1550 (11th Cir. 1996) (recognizing that the "permissibility of federal equitable relief" may be based on "the absence of an adequate state forum for raising the issue").

The district court was not permitted or required to decline to exercise jurisdiction.  Had the issue been raised below, the district court would have had no basis for abstention.

### 4.     The injunction is consistent with *Preiser*.

Misrepresenting the nature of Walker's claim and requested relief, the City argues that Walker was required to file a habeas corpus petition because he "challenges not only the duration of his confinement but the constitutionality of posting secured bail while awaiting trial . . . ." Appellant's Br. 56. But Walker's claim and request for injunctive relief are properly brought under § 1983 and do not fall "within the core of habeas corpus" because vindication of Walker's constitutional rights has never hinged on his release from custody. *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 478 (1973)). As the district court's injunction makes clear, the City can adopt various measures other than releasing Walker and similarly situated people to address and protect their rights.

Habeas corpus is a limited remedy appropriate where a prisoner seeks "simple release" from unlawful custody. *See Munaf v. Geren*, 553 U.S. 674, 693 (2008) (holding "habeas [was] not appropriate" where petitioners sought not only release from custody but also "a court order requiring the United States to shelter them"). If a claim would not "necessarily spell speedier release" from confinement, it is properly brought under § 1983. *Skinner v. Switzer*, 562 U.S. 521, 525 (2011) (quoting *Dotson*, 544 U.S. at 81-82 (alteration omitted)). In

addition, an "injunction barring future unconstitutional procedures d[oes] not fall within habeas' exclusive domain." *Dotson*, 544 U.S. at 81.

The injunction sought by Walker and entered by the district court orders the City to "implement post-arrest procedures that comply with the Constitution" so that it treats indigent and non-indigent arrestees the same way. A.601 (Doc. 40 at 73.) This relief leaves the City free to choose among several constitutionally acceptable options without necessarily releasing anyone.

More specifically, the City may continue using money bail or its bail schedule as long as it provides evenhanded detention procedures. For example, if the City chose to keep all arrestees in jail until each had a detention hearing, the disparate treatment that underlies Walker's Fourteenth Amendment claim would be resolved. *See Dotson*, 544 U.S. at 82 (holding injunction would not necessarily release prisoner where defendants retained discretion to "decline to shorten [plaintiff's] prison term"); *cf. Brown v. Plata*, 563 U.S. 493, 512 (2011) (noting prisoner release order placing statewide cap on prison population would "not necessarily require the [defendant] to release any prisoners" because defendant could comply by expanding prison capacity). Or the City could authorize its officers to determine an arrestee's ability to pay near the time of arrest, just as it authorizes officers to accept money, process paperwork, and immediately release people of means. *Cf. Gerstein*, 420 U.S. at 107 n.6 (holding pretrial detainees

41

seeking judicial probable cause hearings properly raised claim under § 1983 because hearing would not necessarily terminate any detainee's custody). Alternatively, the City could do what its revised policy already does for ordinance violators and offer release on non-financial conditions to misdemeanor arrestees who lack cash or property.[21]

The injunctive relief sought here is similar to that sought in other § 1983 cases where relief would "'relat[e] to'" but not provide "'core' habeas corpus relief." *Dotson*, 544 U.S. at 81. In *Gerstein*, pretrial detainees claimed that they were held in violation of the Fourth Amendment because they were not afforded prompt probable cause determinations by an impartial magistrate. 420 U.S. at 105-06. The detainees sought "a judicial hearing on the issue of probable cause . . . ." *Id.* at 107. It was argued that the claim was more appropriate for habeas proceedings because "[no] purpose could be served by a determination of probable cause" other than to release improperly held detainees.[22] The Court declined to inquire into the plaintiffs' subjective expectations and focused instead on whether

---

[21] Any arrestee who declined to sign the bond or agree to its conditions could lawfully be detained until trial. The fact that many arrestees would choose to sign does not necessarily negate the City's power to hold them if they do not. *Cf. Skinner*, 562 U.S. at 1299 (holding injunction would be proper under § 1983 even though prisoner's "*ultimate* aim" was "to use the [results of an injunction] as a platform for attacking his [custody]").

[22] Br. of State of Texas as Amicus Curiae, *Gerstein v. Pugh*, No. 73-477, 1974 WL 186448, at *9 (U.S. Aug. 19, 1974).

the injunction would necessarily result in a detainee's release.  *Gerstein*, 420 U.S. at 107 n.6.  Finding that it would not, the Court held that "the lawsuit did not come within the class of cases for which habeas corpus is the exclusive remedy."  *Id.*

As in *Gerstein*, the injunction in this case is addressed to unconstitutional procedures and not custody as such.  It allows the City considerable discretion in shaping the remedy and leaves to local officials the final decision on releasing particular arrestees.  The district court correctly concluded that the preliminary injunction was not "within habeas' exclusive domain."  *Dotson*, 544 U.S. at 81.

### 5.    The City can be enjoined from enforcing its bail policy.

While conceding that it "released [Walker] from custody on his own recognizance" by "agreement of counsel" the day after this case was filed, Appellant's Br. 2, the City contends that it lacks not only the power to release its arrestees but also the lesser power to implement evenhanded post-arrest procedures, *id.* at 57-62.  The City bases this view mainly on cases arising in Texas, Montana, and elsewhere.  *See id.* at 58-60.  The district court, consulting Georgia law, A.590-93 (Doc. 40 at 62-65), correctly rejected it.

Under § 1983, the City can be enjoined because its post-arrest procedures constitute City policy.  *See Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978).  In addition, and independent of § 1983, longstanding principles of equity jurisprudence establish that federal courts have the power to stop

43

government actors from committing federal constitutional violations, even when they enforce a policy that they claim is *required* by the state or some other authority.

### a. Under § 1983, the challenged conduct is the result of the City's official policy.

There are "several different ways of establishing municipal liability under § 1983." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986). The most direct is by showing an "official policy enacted by [a municipality's] legislative body." *Hoefling*, 811 F.3d at 1279. But a policy can be created by less formal means, as when a city delegates policymaking authority to a particular official without providing an opportunity "for 'meaningful' review'" of the official's decisions, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004), or ratifies a subordinate official's decision, *see Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002). Similarly, a municipal policy is established when city policymakers "acquiesce[] in a longstanding practice that constitutes the entity's standard operating procedure." *Id.* (citations omitted); *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (same). These forms of policymaking are not mutually exclusive. "With respect to a particular action, more than one official or body may be a final policymaker; final policymaking authority may be shared." *McMillan v. Johnson*, 88 F.3d 1573, 1578 (11th Cir. 1996).

The district court found that the City was liable for its bail policy on three independent grounds. First, the City has control over the post-arrest procedures applied to its arrestees. A.592-93 (Doc. 40 at 64-65). Second, the City has the authority to regulate bail procedures by ordinance. A.592 (Doc. 40 at 64). Third, the municipal judge who the City alleges created the policy acts for the municipality rather than the state. A.590-94 (Doc. 40 at 62-64). Each conclusion is firmly rooted in Georgia law and this Court's precedent.

### i.  The City has control over the post-arrest procedures that its officers apply to arrestees.

The district court correctly held that the City can prevent unconstitutional wealth-based detention of its arrestees by controlling the post-arrest procedures followed by its chief of police. A.592-93 (Doc. 40 at 64-65). Police chiefs act as jailers for their respective cities, and Georgia law places them under the "supervision of the municipal governing authority" when they perform that role. O.C.G.A. § 42-4-1(b). The City of Calhoun's responsibility for seizing, holding, and releasing arrestees enables the City to implement safeguards so that it does not impose extended pretrial detention on the indigent alone. By failing to do so, the City has acquiesced in the policy challenged in this case.

Although the City makes an unsupported assertion that its police chief "is bound to follow" the municipal court's bail schedule, Appellant's Br. 61-62,[23] the bail schedule only limits the City's power to hold detainees who can pay, not its power to release those who cannot.  Nothing about the schedule requires the City to detain any person who cannot pay.   Under the original policy that the City followed when this case was filed, the bail schedule consisted solely of a list of offenses with predetermined bail amounts.    A.299-307 (Doc. 29-5 at 8-16). Nothing in that document diminished the ability of the City's officers to inquire into whether an arrestee who failed to pay the amount listed in the bail schedule had the ability to pay, or to release an indigent arrestee on citation with a promise to appear in court.[24]   Likewise, the revised policy set out in the City's standing bail order contains no limit on the City's power to release arrestees.  A.292-98 (Doc. 29-5 at 1-7).   Simply put, following the bail schedule does not prevent the City from complying with the Constitution or the injunction.

To the extent that the City is arguing that the bail schedule's authorization of detention shields it from liability, this Court has rejected similar arguments.   In

---

[23] Any challenge to the district court's holding on this point is waived by the City's failure to advance any arguments or authorities that support it.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).

[24] *See, e.g.*, Calhoun Code § 90-39 (providing that a police officer, "upon receiving the written promise of the alleged violator to answer as specified in [a] citation, shall release such person from custody"); *id.* at § 90-43 (making it unlawful for "any person to violate such person's promise to appear").

*Wood v. Orange County*, 715 F.2d 1543 (11th Cir. 1983), a class of former criminal defendants claimed that a Florida county and its comptroller violated their due process rights by filing liens against their property to recover the cost of state-funded counsel in their criminal cases. *Id.* at 1545. The county defendants "maintain[ed] that they [we]re not proper defendants" because "[t]he alleged due process violation . . . was caused by state courts, not them." *Id.* at 1549. Recognizing that a "state court judgment does not, by itself, cause a deprivation of property within the meaning of the Fourteenth Amendment," this Court held that the county was "not entitled to dismissal" of the case because state law gave the county the "authority to enforce the judicially created liens," and enforcement caused the allegedly unconstitutional deprivation of property. *Id.*

Like the judicial liens in *Wood*, the City's bail schedule harms no one until it is rigidly applied by the City's police chief and subordinate officers, who are charged by law with control over the City's arrestees. O.C.G.A. § 42-4-1(b). The City clearly has the practical power to alter post-arrest procedures to avoid prolonged detention of those unable to afford release under the bail schedule, just as it released Walker "by agreement of counsel" the day after he filed his complaint, Appellant's Br. 2, using a "Prisoner Release Authorization" signed not by the municipal judge, but by a City officer, A.288 (Doc. 29-2). By failing to correct unconstitutional procedures of which it was aware, the City may be held

47

liable under § 1983.  *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) ("[A] longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("The continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983.").

### ii.    The City has the power to control post-arrest bail procedures by ordinance.

The City is also liable for "acquiesc[ing] in a longstanding practice" that it has the power to control by ordinance.  *See Hoefling*, 811 F.3d at 1279.  Once it has established a court, a municipality has broad authority to regulate its functioning through ordinances, resolutions, regulations, or charter amendments.  O.C.G.A. §§ 36-35-3(a)–(b), 36-35-6(a)(6).  The powers vested in the City by its charter include every power not expressly prohibited by state or federal law.  A.43 (Calhoun Charter § 1-102).  Similarly, Georgia statutes vest municipalities with plenary power to "define, regulate, and alter" the powers and duties of appointed officers like the municipal judge.  O.C.G.A. § 36-34-2(2).

Georgia law specifically contemplates that municipalities will regulate bail procedures through local legislation.  The Georgia Uniform Municipal Court Rules direct municipal judges to set bail "as provided by applicable municipal charter or

48

ordinance." Ga. Unif. Muni. Ct. R. 18.1. Georgia cities therefore routinely use their lawmaking power to regulate bail amounts, bail schedules, and other matters pertaining to post-arrest procedure. Calhoun itself has done so. *See, e.g.,* Calhoun Code § 90-113(g) (providing person cited for parking violation "may request a hearing before the judge of the municipal court by posting a bond in an amount double the indicated fine").[25]

Dozens of other Georgia cities actively legislate in this area. Many establish specific bail schedules by ordinance.[26] Others require municipal officials other than the judge to approve bail schedules,[27] and some require the governing authority to adopt bail schedules.[28] Several cities have ordinances granting

---

[25] In the neighboring City of Rome, an ordinance allows police officers to receive bail, Rome Code § 12-103(2), and provides that bail may be taken "with security *or without security*, at discretion, in a sum not exceeding $2,500.00 per violation," Rome Code § 13-51 (emphasis added). The Court may take judicial notice of ordinances because they are legislative facts. *United States v. Bowers*, 660 F.2d 527, 530 (5th Cir. Unit B. Sept. 1981).

[26] *See, e.g.*, Kennesaw Code § 38-46 ("The following schedule of cash/property bonds and fine amounts sets out the cash bond amounts for the various offenses processed through the city's municipal court. . . . The schedule may be amended from time to time, provided that no amendment shall be official until adopted by the city council by ordinance."); *see also* College Park Code § 1-10(c); Douglasville Code § 1-10; Greensboro Code § 16-11.

[27] *See, e.g.*, Hapeville Code § 2-7-7 ("The bond shall be in writing in an amount established in a schedule approved by the mayor and council."); *see also* Cedartown Code § 34-37; Conyers Code § 2-5-6; Macon Code § 11-7; Manchester Code § 34-44; Morrow Code § 2-4-6; Smyrna Code § 34-49.

[28] *See, e.g.*, Peachtree City Code § 46-16 ("The city shall adopt a standard fine/cash bond schedule for code enforcement violations for which civil penalties may be

authority to establish a bail schedule to a particular official or group of officials.[29]

Many give non-judges—such as police officers and clerks—the discretion to set and accept bonds.[30]   Municipal ordinances often provide for police officers to engage in various forms of recognizance release in their discretion and subject to enumerated guidelines.[31]   These ordinances make sense because Georgia law grants municipal governments control over the functioning of their municipal courts and specifically provides for local regulation of misdemeanor bail

---

cited. Said standard fine/cash bond schedule shall be kept on file at the court clerk's office and updated from time to time as deemed necessary by the city."); *see also* Albany Code § 22-164; Austell Charter § 4.13; Colquitt Code § 30-37; Riverdale Code § 50-1; Stockbridge Code § 2.20.080.

[29] *See, e.g.*, Doraville Code § 11.1 ("Bond amounts for offenses shall be in such amounts as shall be established from time to time by the Mayor and Council in consultation with the municipal court clerk, the chief of police, and the municipal court judges."); *see also* Decatur Code § 22-49; Griffin Code § 38-6; Lake City Code § 24-5; Marietta Code § 1-12-060; Norcross Code § 10.7; Roswell Code § 11.2.1; Senoia Code § 44-6.

[30] *See, e.g.*, Atlanta Code § 62-81 ("The chief of corrections or designated representatives and the chief judge and the associate judges of the municipal court are authorized to receive appearance or other bonds … as they shall deem necessary, to secure the attendance of defendants and witnesses in municipal court."); *see also* Jonesboro Code § 30-18; LaGrange Code § 5-20-13; Sylvania Code § 46-26; Sylvester Code § 38-45; Union Point Code § 34-48.

[31] *See, e.g.*, Colquitt Code § 30-37 ("In lieu of an appearance bond, a person arrested for violation of a city ordinance may be released on his own recognizance or may deposit his driver's license with the arresting officer, the police chief or a municipal judge if, in any of these officials' determinations, the person will appear at the time set for the court appearance in view of [a number of considerations] . . . ."); *see also* Cairo Code § 9-13; Camilla Code § 2-5-6; College Park Code § 1-10(c); Flowery Branch Code § 23-6(b); Peachtree City Code § 46-51; Warner Robins Code § 15-8.

procedures.  Ga. Unif. Muni. Ct. R. 18.1.  The City identifies no authority to support its view that these cities have all been violating some unidentified state law.

Contrary to the City's assertions, the district court did not err by "rely[ing] on the City's Code for the proposition that the City 'possesses considerable control over the municipal court[.]'"  *Cf.* Appellant's Br. 61 (quoting Doc. 40 at 64).  As municipal control is, at bottom, a matter of state law, it is proper to "accord some deference to the evaluation of the district judge who is familiar with local law." *Mandel v. Doe*, 888 F.2d 783, 792 n.16 (11th Cir. 1989).  Although the City claimed below that its "only power" regarding "court administration" concerns "the appointment or termination of the judge," A.265-66 (Doc. 29 at 7-8) (citing Calhoun Charter § 6-102), the district court could read the charter for itself and see that it grants the City plenary power to the limit allowed by state and federal law. *See* A.318 (Doc. 29-6 at 6) (Calhoun Charter § 1-102); A.321 (Doc. 29-6 at 9) (Calhoun Charter § 1-104) ("The specific mention or failure to mention particular power shall not be construed as limiting in any way the powers of the city."). Georgia law is equally broad.  *See, e.g.*, O.C.G.A. § 36-34-2(2) (recognizing municipality's power to "define, regulate, and alter" the powers of its appointed officials).

51

It cannot be disputed that the City has the power to control the bail procedures challenged in this case. Accordingly, the City may be held liable under § 1983. *See Brown*, 923 F.2d at 1481 (holding that a municipality may be liable for failing to stop "a longstanding and widespread practice"); *Depew*, 787 F.2d at 1499 (same). [32]

### iii. The City's municipal judge is a final policymaker for the City, not the state.

Finally, the district court correctly held that the City's municipal judge is a city policymaker and not a state official when promulgating post-arrest procedures. Whether an official is a municipal policymaker "is a question of state law." *Pembaur*, 475 U.S. at 483. "The key question" in determining whether officials act for the state or a municipality "is not what . . . powers [they] have, but *for*

---

[32] Amici argue in passing that the power to regulate bail procedures locally has been preempted by statute. Br. for Amici Curiae Ga. Muni. Ass'n et al. 4. The City has not made such an argument at any stage, and "arguments raised only by amici may not be considered" on appeal. *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991); *see Fed. Trade Comm'n v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1010 n.4 (2013). In any event, the argument is meritless. No statute bars local regulation of bail procedures and the statutes addressing bail do not amount to the sort of comprehensive statutory scheme, *see City of Macon v. Davis*, 305 S.E.2d 116, 118 (Ga. 1983), that would preclude local regulation of bail. Indeed, Georgia court rules expressly provide for local regulation of bail by ordinance. Moreover, local legislation to provide prompt release for the indigent only "augments and strengthens" and does not "detract from or hinder the operation of" state bail statutes. *See Grovenstein v. Effingham Cty.*, 414 S.E.2d 207, 210 (Ga. 1992) (quoting *City of Atlanta v. Assoc. Builders & Contractors of Ga.*, 242 S.E.2d 139, 141 (Ga. 1978)).

*whom* [they] exercise that power." *Manders v. Lee*, 338 F.3d 1304, 1319 (11th Cir. 2003) (en banc).

Under Georgia law, a "municipal court is a municipal office discharging strictly municipal functions" for its local government. *See Ward v. City of Cairo*, 583 S.E.2d 821, 823 (Ga. 2003). The Georgia Constitution exempts municipal courts from all of its substantive provisions governing the state judiciary. Ga. Const. art. VI, § 1, ¶ 1. Unlike state-level courts, municipal courts are treated as instruments "of the municipalities in which they are located" and are distinct from "the state court system." *See City of Lawrenceville v. Davis*, 502 S.E.2d 794, 797 (Ga. 1998). And Georgia law defines the authority exercised by these courts as deriving from a municipality's own judicial power. *See, e.g.*, O.C.G.A. § 36-33-1(b) (limiting municipal corporations' liability for "errors in performing their . . . judicial powers").

In practical terms, Georgia has relinquished to municipalities substantial control over the office of the municipal judge. *Cf. Abusaid v. Hillsborough Cty. Bd. of Comm'rs*, 405 F.3d 1298, 1306 (11th Cir. 2005) (noting that state granted counties "substantial control" over sheriff where counties were "free to change [the sheriff's selection] procedure or even to abolish the office of the sheriff altogether"). A municipal corporation is not required to appoint a designated judge. *See* O.C.G.A. § 36-32-2(b). If it does so, the municipality has unfettered

discretion to select its judges and to set their compensation based on purely local prerogatives. O.C.G.A. § 36-32-2(a) (2015). At all times relevant to this appeal, Georgia municipalities also had plenary discretion to discharge judges, who served "at the pleasure of the governing authority." O.C.G.A. § 36-32-2(a) (2015)[33]; *see* A.55 (Calhoun Charter § 6-102(a)).[34]

The power to appoint and remove a municipal judge carries with it the power to control the judge's administrative policies and procedures. The Georgia Supreme Court confirmed that control in *Ward*, where a city's mayor and city council "directed [their judge] to reinstate" a fired probation services provider, and "terminated [the judge's] employment" when he failed to comply. 583 S.E.2d at 822. The judge complained that the power to remove him "authorize[d] the city to control [the] court's day-to-day activities" in violation of the separation-of-powers principle. *Id.* at 823. Consistent with the unique status of municipal courts, the

---

[33] The General Assembly recently established a procedure for removing municipal judges. O.C.G.A. § 36-32-2.2. The procedure was not in effect when the district court entered the injunction, and would not affect the City's liability in this case. The new statute continues to give municipalities plenary power to establish grounds for removal of the judge as long as the grounds are specified in the municipal charter. O.C.G.A. § 36-32-2.2(b).

[34] The local control that municipalities have over their judges is foreign to judges of state-level courts. State judges are elected by citizens or appointed by state officials. *See, e.g.*, O.C.G.A. § 15-9-1. Their minimum compensation is determined by state law. *See, e.g.*, O.C.G.A. § 15-9-63(a)(1). Once seated, state-court judges are removable only by the Georgia Supreme Court. Ga. Const. art. VI, § 7, ¶¶ 6-8; *cf.* Ga. Const. art. VI, § 1, ¶ 1 (exempting municipal courts from these provisions).

Georgia Supreme Court rejected that argument and held that only state officials are limited by the separation of powers. *Id.* at 823. Because "the municipal court is a municipal office discharging strictly municipal functions," *id.*, a city's governing body may lawfully exert control over a recalcitrant judge.

While the City and amici maintain that a municipal judge's actions "are properly attributed to the state rather than the municipality," *see, e.g.*, Br. for Amici Curiae Ga. Muni. Ass'n et al. 8 (quoting *Singletary v. District of Columbia*, 685 F. Supp. 2d 81, 92 (D.D.C. 2010)), they cite only foreign law for that rule. The problem for the City is that decisions in this area are "highly dependent on the particularities of state law," *Abusaid*, 405 F.3d at 1305, and "Georgia law differs in several significant respects from the law in [other] states," *Owens v. Fulton Cty.*, 877 F.2d 947, 951 (11th Cir. 1994). The district court cannot have abused its discretion by failing to consult the laws of the forty-nine other states when every indication in Georgia law establishes that a municipal judge is a municipal officer "discharging strictly municipal functions." *Ward*, 583 S.E.2d at 823.

The City also argues that the municipal judge is a state actor because state statutes empower the municipal judge to establish a bail schedule. Appellant's Br. 60. This argument fails because "it is not sufficient that [an official's] powers and duties are derived from state law." *See Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 771 (11th Cir. 2014). Officials may render their municipalities liable even

though it is state law that grants those officials "final policymaking authority in their respective municipalities for [particular] matters." *See Cooper v. Dillon*, 403 F.3d 1208, 1222 (11th Cir. 2005) (finding Florida police chief was final policymaker for city with respect to "matters of police procedure" based partly on state statutes vesting authority in police chiefs); *Abusaid*, 405 F.3d at 1309 (stating that existence of state-imposed duties did not "transform sheriffs into state officers in the execution of all duties").

The City nonetheless argues that "actions taken by municipal judges in their judicial capacities cannot constitute municipal policy." Appellant's Br. 58. But a judge's signature does not turn the administrative creation of a prospectively applicable schedule of fines, fees, and bails into a judicial act. Nor does it turn the administrative decision of when to open and staff the municipal court for first appearances or bail hearings into a judicial act. There is "an intelligible distinction between judicial acts and the administrative, legislative, or executive functions" that judges sometimes perform. *Forrester v. White*, 484 U.S. 219, 228 (1988). Judicial acts involve performing "the adjudicative function" to resolve disputes between adversaries in particular controversies, *id.* at 226-27, and that function is not at work in making bail schedules or post-arrest procedures "of general application" to all of the City's arrestees for use even before judicial proceedings have begun, *cf. Supreme Ct. of Va. v. Consumers Union*, 446 U.S. 719, 731 (1980)

(citation omitted) (holding that state-court judges did not act in a judicial capacity when they created disciplinary rules for attorneys).

It is undisputed, *see* Appellant's Br. 57-62, that the City of Calhoun treats its municipal judge as a final policymaker with respect to the post-arrest money bail procedures applied to City arrestees, as there is no "actual 'opportunity' for 'meaningful' review" of the judge's policies with respect to bail before they are implemented. *See Holloman*, 370 F.3d at 1292. Although the City strains to disown its judge in this litigation, Georgia law places the judge firmly within the municipal government.

> **b.** **Independent of § 1983, there is an implied right of action under the Constitution for equitable relief against the City.**

Despite Georgia law expressly granting cities control over their arrestees, broadly authorizing regulation of local detention and bail procedures, and clearly identifying municipal courts as arms of local governments, the City declines to engage with those authorities. Instead, relying primarily on other jurisdictions' cases involving challenges to very different practices, the City contends that the district court could not enjoin it from "wrongfully incarcerating indigent defendants" because a municipal judge made "the relevant decisions" for the City to follow. Appellant's Br. 57; *see id.* at 57-62. But even assuming the City's untenable premise that its judge is an external official whose orders bind the City

as a matter of local law, the City would still be subject to an injunction for its ongoing policy of following those orders.

In carrying out their functions, government actors have an obligation not to violate the Constitution. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908). And when an actor breaches that duty, a federal court may use its equitable powers to enforce compliance even though the actor was following state or local law. *Id.*; *see Terrace v. Thompson*, 263 U.S. 197, 214 (1923) ("Equity jurisdiction will be exercised to enjoin the threatened enforcement of a state law which contravenes the federal Constitution . . . ."); *see also Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218 (1964) (enjoining county officials). Indeed, equitable relief "'has long been recognized as the proper means for preventing entities from acting unconstitutionally'" even where no statute provides a right of action. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (Roberts, C.J.) (quoting *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

Therefore, the fact that local officials perceive themselves to be bound by pronouncements of "state legislators," "state executive [officials]," or "judicial officers" does not prevent them from being properly enjoined by a federal court. *See Cooper v. Aaron*, 358 U.S. 1, 17 (1958) (recognizing contrary rule would allow federal rights to be "nullified" by state and local officials). Even if the City had established—and it has not—that its municipal judge is both external to and

superior to the City's government in creating procedures for bail and the release of arrestees, the City could still be enjoined prospectively from enforcing those procedures.  A policy of enforcing some other official's unconstitutional policies, even if it did not satisfy § 1983's requirement of an official municipal policy or custom, *see Los Angeles Cty. v. Humphries*, 562 U.S. 29, 38-39 (2010); *Monell*, 436 U.S. at 691, would still subject the City to injunctive relief.  *See Free Enter. Fund*, 561 U.S. at 491 n.2.

## II.    The District Court Acted Within Its Discretion in Finding That Equitable Considerations Favor a Preliminary Injunction.

### A.    Walker Would Suffer Irreparable Harm Absent Injunctive Relief.

Plaintiff class members—arrestees who risked imminent detention for inability to pay small bail sums—would have been irreparably harmed absent an injunction.   This Court has characterized pre-trial confinement as "heavily burdensome."  *Rainwater*, 572 F.2d at 1056.  The City's argument that harm to Walker and other arrestees is too "speculative," Appellant's Br. 62, disregards the obvious hardships inherent in any period of physical confinement in jail.  *See, e.g.*, *United States v. Bogle*, 855 F.2d 707, 710–711 (11th Cir. 1988) (holding "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *see also Hispanic Interest Coalition of Ala. v. Governor of Ala.*, 691 F.3d 1249 (11th Cir. 2012) (explaining that harms are irreparable when they cannot be "undone" or later "compensated by monetary damages").

59

### B.    The Balance of Equities Favors Protecting Walker's Fundamental Rights.

The City's claim of harm is unconvincing.  First, the City states it has been harmed because its arrestees "pose a risk or danger to the community." Appellant's Br. 65.  But the City's bail policy does not consider dangerousness in considering who to release.  Rather, the City deems every arrestee eligible for immediate release after payment of a small sum.  Public safety is not advanced by preventatively detaining only the indigent.[35]

Second, the City faults the trial court for entering an injunction in favor of class members "because the class had not yet been certified."  Appellant's Br. 64. It appears the City is quarreling with the fact that the certification order was e-filed two minutes after the injunction.[36]  But *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), to which the City cites, stands only for the proposition that courts should not grant relief to unnamed class members in a case in which

---

[35] In the court below, the City similarly argued that it would be unwise to release people who are under the influence of drugs or alcohol.  A.400 (Doc. 36 at 16). But enjoining the City's policy has no bearing on that issue.  The policy permits all people to be released, sober or not, upon payment.  Moreover, as the district court explained after the City raised this issue in opposing class certification, "other laws may give [the City] authority to detain intoxicated arrestees without bond, and . . . any Order that the Court may issue preventing [the City] from continuing to detain arrestees solely because of inability to pay will not diminish that authority."  A.632 (Doc. 41 at 29 n.7).

[36] According to the notices of electronic filing received from the district court by undersigned counsel, the preliminary injunction was entered on January 28, 2016, at 4:18 p.m., and the order granting class certification was entered at 4:20 p.m.

certification has been *denied*. Class certification was granted here. A.604 (Doc. 41).

Third, the City claims that "[b]y granting the preliminary injunction," the District Court "forc[ed]" the city court "to employ a system of unsecured recognizance bonds which are nonexistent under the laws of the State of Georgia." Appellant's Br. 67-68. The district court has not "forced" the City to employ *any* particular method of release. Its order permitted the City to choose whatever constitutional alternative it so wished. A.601-02 (Doc. 40 at 73-74).

In short, the balance of equities favors Walker because the City "has no interest in enforcing a [policy] that is unconstitutional . . . ." *Hispanic Interest Coalition,* 691 F.3d at 1249; *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("[W]e discern no harm from the state's nonenforcement of invalid legislation."). In contrast, the concrete harm that the City's policy causes arrestees is not debatable, and Walker is likely to prevail on the merits of his claim that the policy causes unconstitutional harm. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (recognizing that high likelihood of success on merits impacts assessment of the other preliminary injunction factors).

### C.     The Injunction Advances the Public Interest.

The district court's injunction advances the public interest by ensuring that the City replaces its unconstitutional policy with one that protects the rights of its

arrestees. *See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he public has no interest in the enforcement of what is very likely an unconstitutional statute."). Therefore, the district court correctly found that the public interest would not be harmed and that the equities in this case favored enjoining the City's policy.

## CONCLUSION

The Court should affirm the district court's order granting a preliminary injunction.

Respectfully submitted,

/s/ Alec Karakatsanis             /s/ Sarah Geraghty
Alec Karakatsanis                 Sarah Geraghty
EQUAL JUSTICE UNDER LAW           Ryan Primerano
601 Pennsylvania Ave NW           SOUTHERN CENTER
Suite 900                         FOR HUMAN RIGHTS
Washington, DC 20004              83 Poplar Street NW
(202) 681-2409                    Atlanta, GA 30303
alec@equaljusticeunderlaw.org     (404) 688-1202
                                  sgeraghty@schr.org

*Counsel for Plaintiff-Appellee*

August 11, 2016

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), as modified by this Court's Order dated July 25, 2016, because it contains 15,768 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface using Microsoft Word 14-point Times New Roman.

/s/ Sarah Geraghty

August 11, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2016, I served the foregoing document by filing a copy with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

/s/ Sarah Geraghty